QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Claude M. Stern (Bar No. 96737)
  claudestern@quinnemanuel.com
  Evette D. Pennypacker (Bar No. 203515)
  evettepennypacker@quinnemanuel.com
  Thomas R. Watson (Bar No. 227264)
  tomwatson@quinnemanuel.com
555 Twin Dolphin Dr., 5th floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

  Joshua L. Sohn (Bar No. 250105)
  joshuasohn@quinnemanuel.com
  Sam S. Stake (Bar No. 257916)
  samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

Attorneys for Defendant Fusion Garage PTE Ltd.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| TECHCRUNCH, INC., a Delaware Corporation, and CRUNCHPAD, INC., a Delaware Corporation, | CASE NO. 3:09-cv-05812-RS (PSG) |
| Plaintiffs, | **FUSION GARAGE'S AMENDED ANSWER TO PLAINTIFFS' AMENDED COMPLAINT** |
| vs. | |
| FUSION GARAGE PTE LTD., a Singapore Company, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Defendant Fusion Garage PTE Ltd. ("Fusion Garage"), answering the Amended Complaint

of Plaintiffs TechCrunch, Inc. ("TechCrunch") and CrunchPad, Inc., and without prejudice to

raising a declaratory judgment counterclaim if Plaintiffs change its position that it has no

intellectual property rights in Fusion Garage's product(s) (see Dkt. 203 at 1; Dkt. 204 at 2), pleads

and avers as follows.

## INTRODUCTORY STATEMENT

1.    Fusion Garage denies the allegations in Paragraph 1.

2.    Fusion Garage denies the allegations in Paragraph 2.

3.    Fusion Garage denies the allegations in Paragraph 3.

4.    Fusion Garage denies that it was ever involved in a joint venture with Plaintiffs. Fusion Garage responds that the statements in Paragraph 4 have been taken out of context, considering Fusion Garage's fear about being the subject of Plaintiffs' history of threatening to use the TechCrunch blog to "trash"  and cause a "hail storm of negative press" to fall upon anyone who they believe to have crossed them, however unfounded.  (Exs. A, B, C at 334-335.)  Fusion Garage denies the remaining allegations of Paragraph 4.

5.    Fusion Garage admits that Plaintiffs purport to bring this suit to seek redress for the purported misconduct alleged in the Amended Complaint, but denies the remaining allegations in Paragraph 5.

## PARTIES

6.    Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6, and therefore denies them.

7.    Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 7, and therefore denies them.

8.    Fusion Garage admits that it is a Singapore company with its principle place of business in Singapore.  The second sentence of Paragraph 8 states a legal conclusion to which no response is required.  Fusion Garage admits that Chandrasekhar Rathakrishnan is a Singapore national and is the chief executive of Fusion Garage.  Fusion Garage further denies the remaining allegations of Paragraph 8.

## JURISDICTION

9.    Fusion Garage admits that this Court has original jurisdiction over the action under 28 U.S.C. § 1332.

**VENUE**

10.     For purposes of this action, Fusion Garage does not contest venue in the United States District Court for the Northern District of California.   Fusion Garage denies the substance of the remaining allegations in Paragraph 10.

**INTRADISTRICT ASSIGNMENT**

11.     Fusion Garage admits that Plaintiffs initially brought claims under the Lanham Act, for which this action was not subject to intradistrict assignment.  Plaintiffs' Lanham Act claims were dismissed in an Order by Judge Seeborg dated August 24, 2010.

**FACTS COMMON TO ALL CAUSES OF ACTION**

12.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12, and therefore denies them.

13.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13, and therefore denies them.

14.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 14, and therefore denies them.

15.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the in Paragraph 15, and therefore denies them.  Fusion Garage states that Exhibit 1 and the quoted language speak for themselves.

16.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 16, and therefore denies them.  Fusion Garage states that Exhibit 2 and the quoted language speak for themselves.

17.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 17, and therefore denies them.

18.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 18, and therefore denies them. Fusion Garage admits that Mr. Rathakrishnan met Michael Arrington while at TechCrunch 50.

Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in the second sentence of Paragraph 18, and therefore denies them.

19.     Fusion Garage states that Exhibit 3 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion Garage further denies the remaining allegations of Paragraph 19.

20.     Fusion Garage admits that Mr. Arrington, TechCrunch CEO Heather Harde, and Mr. Rathakrishnan met on September 23, 2008, but lacks knowledge or information sufficient to belief as to the truth or falsity of the allegations of the remainder of the first sentence of Paragraph 20, and therefore denies them.  Fusion Garage states that Exhibit 4 and the quoted language speak for themselves.  Fusion Garage denies the remaining allegations in Paragraph 20.  Fusion Garage further avers that Mr. Arrington even admitted that from the outset the only way TechCrunch and Fusion Garage could work together would be through a merger of their corporate entities.  (Ex. D at 85:1-6) ("The first meeting I had with Chandra was, I believe, in – I believe in October . . . *At that meeting, we, Chandra and I, agreed that the only way to work together was a merger of the entities*.") (emphasis added).

21.     Fusion Garage states that Exhibit 5 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.

22.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first two sentences of Paragraph 22, and therefore denies them.  Fusion Garage admits that CrunchPad, Inc. would have been the entity to merge with Fusion Garage had the parties' merger talks succeeded.   Fusion Garage denies that the parties ever collaborated on a web tablet in parallel with their merger talks.  Fusion Garage further avers that the parties never consummated this merger.  On December 18, 2008, Ms. Harde sent Rathakrishnan a "Letter of Intent" to acquire Fusion Garage for a lump-sum of cash plus 8 percent stock in CrunchPad, Inc., a new shell company that TechCrunch set up to commercialize their web tablet idea.  (Ex. E.)  Notably, the Letter of Intent was unsigned, and included a limited "no-shop" provision, under which Fusion Garage could shop itself to other corporate suitors if no merger was

struck within 60 days. (*Id.* at FG00001047.) This no-shop provision shows that TechCrunch did not consider Fusion Garage to be a "joint venturer" who was bound by duties of loyalty to TechCrunch. (*See also* Ex. F ("Tariq pitched me on using [his operating system] for the tablet. It doesn't work for what we're doing, but it's a cool UI and ***if FG gives us any crap about terms we should suggest they are our alternative.***" (emphasis added).) Rather, Fusion Garage was simply a potential acquisition target who could walk away and/or merge with other companies if it did not merge with CrunchPad, Inc. within this 60-day window. TechCrunch knew that the Letter of Intent was, in fact, a clear expression that there would be no legal relationship between the parties unless they entered into a formal, written agreement to do so. Mr. Arrington, Ms. Harde, and TechCrunch contractor Louis Monier explained to Fusion Garage in no uncertain terms that Arrington could not "formalize something with [Fusion Garage] (as in signed papers) until [Plaintiffs] close the round of funding" and that the funding and merger must "happen in the right order." (Ex. G.)

23. Fusion Garage admits that a prototype known as "Prototype B" was constructed as of January 19, 2009 and that Fusion Garage provided the source code for "Prototype B." Fusion Garage avers that it offered this technology to TechCrunch under the mistaken belief—based on representations by Mr. Arrington—that Mr. Arrington and TechCrunch were well-connected in the venture capital community and would be able to arrange for an acquisition of Fusion Garage. Mr. Arrington and TechCrunch failed to arrange this acquisition and failed to secure any funding for Fusion Garage. Indeed, Mr. Arrington and TechCrunch were turned down by no less than 16 different venture capital funding sources. Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remainder of the allegations in Paragraph 23, and therefore denies them.

24. Fusion Garage states that Exhibit 6 and the quoted language speak for themselves. Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 24, and therefore denies them.

25.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 25, and therefore denies them. Fusion Garage denies the remaining allegations of Paragraph 25.

26.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 26, and therefore denies them.  Fusion Garage states that Exhibit 7 and the quoted language speak for themselves.

27.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 27, and therefore denies them.  Fusion Garage avers that Louis Monier—the consultant that Plaintiffs allegedly hired to spearhead their web tablet efforts—remarked to Mr. Rathakrishnan around this time that Plaintiffs' web tablet project "had no legs," that there was insufficient funding available, and that Fusion Garage should figure out what to do on its own should it wish to pursue a web tablet.  (Ex. H at 259:12-17.)

28.     Fusion Garage denies the allegations in Paragraph 28.

29.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 29, and therefore denies them.

30.     Fusion Garage admits that it drove the industrial design and hardware work for its own web tablet out of Singapore, and that it should get the credit for developing the tablet.  (Ex. I.) Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 30, and therefore denies them.  Fusion Garage states that Exhibit 8 and the quoted language speak for themselves.

31.     Fusion Garage denies the allegations in Paragraph 31.

32.     Fusion Garage states that Exhibit 9 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 32.

33.     Fusion Garage states that Exhibit 10 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 33.

1      34.     Fusion Garage denies the allegations in Paragraph 34.

2      35.     Fusion Garage denies the allegations in the first sentence of Paragraph 35.  Fusion

3  Garage avers that Mr. Arrington recognized around this time that any merger with Fusion Garage

4  was doomed without further venture capital funding.  Fusion Garage states that Exhibit 11 and the

5  quoted language speak for themselves.  By August 2009, Mr. Arrington had told Fusion Garage

6  and third parties that the "CrunchPad" was "dead."  (Exs. J, K.)  Fusion Garage lacks knowledge

7  or information sufficient to form a belief as to the truth or falsity of the remaining allegations in

8  Paragraph 35, and therefore denies them.

9      36.     Fusion Garage states that Exhibit 12 and the quoted language speak for themselves.

10  Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion

11  Garage denies the remaining allegations in Paragraph 36.

12      37.     Fusion Garage denies the allegations in Paragraph 37.

13      38.     Fusion Garage states that Exhibit 13 and the quoted language speak for themselves.

14  Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion

15  Garage denies the remaining allegations in Paragraph 38.

16      39.     Fusion Garage states that Exhibit 13 and the quoted language speak for themselves.

17  Fusion Garage denies Plaintiffs' characterization and interpretation of this language. Fusion

18  Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

19  remaining allegations in Paragraph 39, and therefore denies them.

20      40.     Fusion Garage states that Exhibit 13 and the quoted language speak for themselves.

21  Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion

22  Garage denies the remaining allegations in Paragraph 40.

23      41.     Fusion Garage denies that the parties engaged in any ongoing collaboration

24  separate and apart from their merger talks.  Fusion Garage states that Exhibit 14 and the quoted

25  language speak for themselves.  Fusion Garage denies Plaintiffs' characterization and

26  interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 41.

27  Indeed, Mr. Arrington and Mr. Rathakrishnan agreed from the outset that the ***only way***

28

1    TechCrunch and Fusion Garage could work together would be through a merger of their corporate

2    entities.  (Ex. D at 85:1-6)

3              42.    Fusion Garage admits that Mr. Rathakrishnan met Mr. Kindle at TechCrunch's

4    offices in July 2009.  Fusion Garage avers that Mr. Kindle—as he has conceded under oath—

5    made no significant contribution to the hardware or software developed by Fusion Garage.  Mr.

6    Kindle was so unfamiliar with Fusion Garage's development efforts and the relevant technology

7    that he conceded he had no knowledge about how the CrunchPad's prototypes evolved after he

8    was hired in July 2009, and he could not identify something as basic as whether the final product's

9    form factor would be plastic or metal.  In fact, Mr. Kindle was so detached from any development

10   process that he could not even identify photographs of any version of the Fusions Garage

11   prototype.  Fusion Garage denies the remaining allegations in Paragraph 42.

12             43.    Fusion Garage denies the allegations in Paragraph 43.

13             44.    Fusion Garage states that Exhibit 15 and the quoted language speak for themselves.

14   Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion

15   Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

16   remaining allegations in Paragraph 44, and therefore denies them.  Fusion Garage further avers

17   that around this same time TechCrunch threatened Pegatron that, if it did not drop the demand for

18   a $700,000 Non-Recurring Engineering fee to manufacture the web tablet, that TechCrunch would

19   abandon any interest in developing the CrunchPad and Pegatron would instead have to

20   manufacture the web tablet for Fusion Garage without TechCrunch's involvement.  Or, as

21   Pegatron recounted a conversation that it had with TechCrunch's contractor, Brian Kindle:

22               [Pegaron understands from Kindle that] if Pegatron is not willing to
                 change current agreement and MOU ($700K NRE / 1200K life
23               cycle), TechCrunch will drop out of this business and stop merging
                 Fusion Garage.  Fusion Garage will not get any supporting [sic]
24               from TechCrunch or certain famous business units.  ***But, Fusion
                 Garage may keep doing business with Pegatron by itself***.
25

26   (Ex. L) (emphasis added.)  Accordingly, Mr. Arrington and TechCrunch clearly believed that they

27   owed no fiduciary duties to Fusion Garage and that Fusion Garage owed none to Arrington or

28

TechCrunch, and that Fusion Garage had the option of going-it-alone in developing its own web tablet.

45. Fusion Garage states that Exhibit 15 speaks for itself. Fusion Garage denies Plaintiffs' characterization and interpretation of Exhibit 15. Fusion Garage denies the remaining allegations in Paragraph 45.

46. Fusion Garage states that Exhibit 16 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language. Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 46, and therefore denies them.

47. Fusion Garage denies the allegations in Paragraph 47.

48. Fusion Garage states that the photos in Paragraph 48 speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of the photos. Fusion Garage denies the remaining allegations in Paragraph 48.

49. Fusion Garage denies the allegations in Paragraph 49.

50. Fusion Garage denies the allegations in Paragraph 50.

51. Fusion Garage states that Exhibit 17 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language. Fusion Garage denies the remaining allegations in Paragraph 51.

52. Fusion Garage admits that Fusion Garage conducted a demonstration of its web tablet at TechCrunch's offices on or about October 27, 2009, in furtherance of the still-pending merger negotiations. Fusion Garage states that Exhibit 18 speaks for itself. Fusion Garage denies the remaining allegations in Paragraph 52.

53. Fusion Garage states that Exhibit 19 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language. Fusion Garage denies the remaining allegations in Paragraph 53.

54.     Fusion Garage states that Exhibit 20 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 54.

55.     Fusion Garage states that Paragraph 55 contains a legal conclusion to which no response is required.  Fusion Garage otherwise denies the allegations in Paragraph 55.

56.     Fusion Garage denies the allegations in Paragraph 56, including subparagraphs (a)-(i), as well as the implication that TechCrunch had anything to do with the development of Fusion Garage's web tablet.

57.     Fusion Garage admits that it rightfully claims ownership of the product that it developed on its own.  Fusion Garage denies the remaining allegations in Paragraph 57.

58.     Fusion Garage denies the allegations in Paragraph 58, including the implication that the parties were ever in a joint venture.

59.     Fusion Garage states that the email reproduced in this paragraph speaks for itself. Fusion Garage denies Plaintiffs' characterization and interpretation of the email.  Fusion Garage denies the remaining allegations in Paragraph 59.

60.     Fusion Garage states that Exhibit 21 speaks for itself and that no further response is required.  Fusion Garage further denies the remaining allegations of Paragraph 21.

61.     Fusion Garage denies the allegations in Paragraph 61.  Fusion Garage avers that Plaintiffs and their founder, Michael Arrington, have a long history of threatening to "trash" people and companies in their TechCrunch blog.  Fusion Garage's fear of Plaintiffs doing the same to Fusion Garage was justified, especially considering how Plaintiffs have simultaneously with this lawsuit publicly harassed Fusion Garage in numerous blog posts.

62.     Fusion Garage denies the allegations in Paragraph 62.

63.     Fusion Garage states that Plaintiffs' wanted to poach Fusion Garage's personnel. (Ex. M ("option 2 is we kill the project and fusion garage also dies . . . option 3 is *we just poach his guys*, run it ourselves."); Ex. N at TC00004114 ("we're working with a Singapore startup that

1   has developed a kick ass working prototype . . . We will either acquire the startup (***or hire the***

2   ***team***).” (emphases added).)  Fusion Garage denies the remaining allegations in Paragraph 63.

3          64.    Fusion Garage denies the allegations in Paragraph 64.

4          65.    Fusion Garage states that Exhibit 22 and the quoted language speak for themselves.

5   Fusion Garage denies Plaintiffs’ characterization and interpretation of this language.  Fusion

6   Garage denies the remaining allegations in Paragraph 65.

7          66.    Fusion Garage states that Exhibit 23 and the quoted language speak for themselves.

8   Fusion Garage denies Plaintiffs’ characterization and interpretation of this language.  Fusion

9   Garage denies the remaining allegations in Paragraph 66.

10          67.    Fusion Garage states that Exhibit 23 and the quoted language speak for themselves.

11   Fusion Garage denies Plaintiffs’ characterization and interpretation of this language, as well as its

12   attribution to Plaintiffs.  Fusion Garage denies the remaining allegations in Paragraph 67.

13          68.    Fusion Garage states that Exhibit 25 and the quoted language speaks for

14   themselves.  Fusion Garage admits that it contracted with McGrath Power to assist in the launch of

15   its web tablet.  Fusion Garage lacks knowledge or information sufficient to form a belief as to the

16   truth or falsity of the remaining allegations in Paragraph 68, and therefore denies them.

17          69.    Fusion Garage states that Exhibit 26 speaks for itself.  Fusion Garage denies

18   Plaintiffs’ characterization and interpretation of Exhibit 26.  Fusion Garage denies the allegation

19   that it “secretly” planned to do anything that it was not entitled to do.  Plaintiffs failed to find

20   financing and developed cold feet with respect to the merger.  Fusion Garage denies the remaining

21   allegations in Paragraph 69.

22          70.    Fusion Garage states that Exhibit 27, the quoted language, and the McGrath Power

23   website speak for themselves.  Fusion Garage denies Plaintiffs’ characterization and interpretation

24   of this language.  Fusion Garage lacks knowledge or information sufficient to form a belief as to

25   the truth or falsity of the allegations relating to the purported McGrath Power website, and

26   therefore denies them.  Fusion Garage further denies the remaining allegations of Paragraph 70.

27

28

71.     Fusion Garage states that Exhibits 28 and 29 and the quoted language speak for themselves, and denies Plaintiffs' characterizations and interpretations.  Fusion Garage also denies that it had any obligation to inform Plaintiffs of these facts alleged in Paragraph 71.  Fusion Garage denies the remaining allegations in Paragraph 71.

72.     Fusion Garage states that it was under no obligation to inform Plaintiffs that "joojoo.com" was registered.  Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 72, and therefore denies them.

73.     Fusion Garage states that Exhibit 30 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation because they are taken out of the context of Plaintiffs' history of threatening to use the TechCrunch.com blog to "trash" and cause a "hail storm of negative press" to fall upon anyone who does not acquiesce to their demands.  Fusion Garage denies the remaining allegations of Paragraph 73.

74.     Fusion Garage states that Exhibit 31 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 74.

75.     Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 75, and therefore denies them.  Fusion Garage states that Exhibit 32 speaks for itself.  Fusion Garage denies Plaintiffs' characterization and interpretation of the exhibit.

76.     Fusion Garage states that Exhibit 32 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 76.

77.     Fusion Garage denies the allegations in Paragraph 77.

78.     Fusion Garage states that Exhibit 33 and the quoted language speak for themselves. Fusion Garage denies Plaintiffs' characterization and interpretation of this language as it is taken

1    out of context and is misinformed.  Fusion Garage denies the remaining allegations in Paragraph

2    78.

3         79.    Fusion Garage states that Exhibits 33 and 34, and the quoted language, speak for

4    themselves.  Fusion Garage denies Plaintiffs' characterization and interpretation of this language

5    as it is taken out of context and is misinformed.  Fusion Garage denies the remaining allegations in

6    Paragraph 79.

7         80.    Fusion Garage states that Exhibit 21 and the quoted language speak for themselves.

8    Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion

9    Garage denies the remaining allegations in Paragraph 80.

10        81.    Fusion Garage states that Exhibit 21 and the quoted language speak for themselves.

11   Fusion Garage denies Plaintiffs' characterization and interpretation of this language.  Fusion

12   Garage denies the remaining allegations in Paragraph 81.

13        82.    Fusion Garage lacks knowledge or information sufficient to form a belief as to the

14   truth or falsity of the allegations in Paragraph 82, and therefore denies them.  Fusion Garage

15   denies the implication that its web tablet was created as a result of a joint venture.

16        83.    Fusion Garage states that Exhibit 36 and the quoted language speak for themselves.

17   Fusion Garage denies Plaintiffs' characterization and interpretation of this language as it is taken

18   out of context and is misinformed.  Fusion Garage denies the remaining allegations in Paragraph

19   83.

20        84.    Fusion Garage states that Paragraph 84 makes legal conclusions to which no

21   responsive pleading is required.  Fusion Garage denies the implication that the parties were ever in

22   a joint venture.

23        85.    Fusion Garage states that Exhibit 37 and the quoted language speak for themselves.

24   Fusion Garage denies Plaintiffs' characterization and interpretation of this language as it is taken

25   out of context and is misinformed.  Fusion Garage admits, however, its very real and justifiable

26   fear of Plaintiffs' and Mr. Arrington's temper toward those who they perceive cross them.

27

28

1    TechCrunch CEO Heather Harde has testified to Mr. Arrington's temper.  (Exs. A, B, C.)  Fusion

2    Garage denies the remaining allegations in Paragraph 85.

3         86.    Fusion Garage states that Exhibit 35 and the quoted language speak for themselves.

4    Fusion Garage denies Plaintiffs' characterization and interpretation of this language.

5         87.    Fusion Garage admits that it announced the launch of its web tablet, the JooJoo, at

6    a December 7, 2009 press conference in San Francisco.  Fusion Garage denies the remaining

7    allegations in Paragraph 87.

8         88.    This paragraph states a legal conclusion to which no responsive pleading is

9    required.  Fusion Garage denies the implication that the parties were ever in a joint venture.

10        89.    Fusion Garage denies the allegations in Paragraph 89.

11        90.    Fusion Garage lacks knowledge or information sufficient to form a belief as to the

12   truth or falsity of the allegations in Paragraph 90, and therefore denies them.

13        91.    Fusion Garage denies the allegations in the first sentence of Paragraph 91.  Fusion

14   Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

15   remaining allegations in Paragraph 91, and therefore denies them.

16        92.    Fusion Garage denies the allegations in Paragraph 92.

17        93.    Fusion Garage denies the allegations in Paragraph 93.

18        94.    Fusion Garage denies the first sentence in Paragraph 94.  Fusion Garage states that

19   Mr. Rathakrishanan's deposition testimony speaks for itself.

20        95.    Fusion Garage states that Exhibit 22 and the quoted language speak for themselves.

21   Fusion Garage denies Plaintiffs' characterization and interpretation of this language.

22        96.    Fusion Garage denies the allegations in Paragraph 96.

23        97.    Fusion Garage denies the allegations in Paragraph 97.

24        98.    Fusion Garage states that Exhibits 23, 16, 25, 38, 28, 18, 29, 20, 30, and 21 and the

25   quoted language speak for themselves.  Fusion Garage denies Plaintiffs' characterization and

26   interpretation of this language.  Fusion Garage denies the remaining allegations in Paragraph 98.

27        99.    Fusion Garage denies the allegations in Paragraph 99.

28

100.    Fusion Garage denies the allegations in Paragraph 100.

101.    Fusion Garage denies the allegations in Paragraph 101.

**FIRST CAUSE OF ACTION:  BREACH OF FIDUCIARY DUTY**

102.    Fusion Garage incorporates its responses to each and every paragraph above with the same force and effect as if fully set forth herein.

103.    Fusion Garage denies the allegations in Paragraph 103.

104.    Fusion Garage denies the allegations in Paragraph 104.

105.    Fusion Garage denies the allegations in Paragraph 105.

106.    Fusion Garage denies the allegations in Paragraph 106.

107.    Fusion Garage denies the allegations in Paragraph 107.

108.    Fusion Garage denies the allegations in Paragraph 108.

109.    Fusion Garage denies the allegations in Paragraph 109.

110.    Fusion Garage responds that this paragraph states a legal conclusion to which no response is required.

111.    Fusion Garage denies the allegations in Paragraph 111.

112.    Fusion Garage responds that this paragraph states legal conclusions to which no responsive pleading is required.  Fusion Garage denies the implication that the parties were in a joint venture.

113.    Fusion Garage denies the allegations in Paragraph 113.

114.    Fusion Garage lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 114, and therefore denies them.  Fusion Garage denies the implication that it needed Plaintiffs' "informed" consent  to "act" in any manner.

115.    Fusion Garage denies the allegations in Paragraph 115.

116.    Fusion Garage denies the allegations in Paragraph 116.

117.    Fusion Garage denies the allegations in Paragraph 117.

**SECOND CAUSE OF ACTION:  FRAUD AND DECEIT**

118.   Fusion Garage incorporates its responses to each and every paragraph above with the same force and effect as if fully set forth herein.

119.   Fusion Garage denies the allegations in Paragraph 119.

120.   Fusion Garage denies the allegations in Paragraph 120.

121.   Fusion Garage denies the allegations in Paragraph 121.

122.   Fusion Garage denies the allegations in Paragraph 122.

123.   Fusion Garage denies the allegations in Paragraph 123.

124.   Fusion Garage denies the allegations in Paragraph 124.

125.   Fusion Garage denies the allegations in Paragraph 125.

126.   Fusion Garage denies the allegations in Paragraph 126.

127.   Fusion Garage denies the allegations in Paragraph 127.

128.   Fusion Garage denies the allegations in Paragraph 128.

**THIRD CAUSE OF ACTION:  UNLAWFUL BUSINESS PRACTICES UNDER**

**CALIFORNIA LAW**

129.   Fusion Garage incorporates its responses to each and every paragraph above with the same force and effect as if fully set forth herein.

130.   Fusion Garage denies the allegations in Paragraph 130.

131.   Fusion Garage denies the allegations in Paragraph 131.

132.   Fusion Garage denies the allegations in Paragraph 132.

133.   Fusion Garage denies the allegations in Paragraph 133.

**FUSION GARAGE'S AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**

**(FAILURE TO STATE A CLAIM)**

134.   The Amended Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

**(ESTOPPEL)**

135.    Plaintiffs' claims are barred in whole or in part by application of the doctrine of estoppel.

**THIRD AFFIRMATIVE DEFENSE**

**(UNCLEAN HANDS)**

136.    Plaintiffs' claims are barred in whole or in part by application of the doctrine of unclean hands.

**FOURTH AFFIRMATIVE DEFENSE**

**(WAIVER)**

137.    Plaintiffs' claims are barred in whole or in part by application of the doctrine of waiver.

**FIFTH AFFIRMATIVE DEFENSE**

**(ACQUIESCENCE)**

138.    Plaintiffs' claims are barred by the doctrine of acquiescence.

**SIXTH AFFIRMATIVE DEFENSE**

**(NO IRREPARABLE HARM)**

139.    Plaintiffs' claims for injunctive relief are barred as a matter of law because Plaintiffs have not suffered any irreparable harm as a result of the acts alleged in the Amended Complaint.

**SEVENTH AFFIRMATIVE DEFENSE**

**(FAILURE TO MITIGATE)**

140.    Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate their alleged damages.

1

**EIGHTH AFFIRMATIVE DEFENSE**

2

**(ADEQUATE REMEDY AT LAW)**

3      141.    Plaintiffs' claims for injunctive relief are barred as a matter of law because

4   Plaintiffs have an adequate remedy at law for any damages resulting from the actions alleged in

5   the Amended Complaint.

6

**NINTH AFFIRMATIVE DEFENSE**

7

**(ABUSE OF PROCESS)**

8      142.    Plaintiffs' claims are without merit and are an attempt to harass Fusion Garage and

9   stifle free competition, such that Plaintiffs' claims constitute an abuse of process.

10

**TENTH AFFIRMATIVE DEFENSE**

11

**(NO CAUSATION)**

12     143.    Plaintiffs' claims are barred because Plaintiffs' damages, if any, were not caused by

13  Fusion Garage.

14

**ELEVENTH AFFIRMATIVE DEFENSE**

15

**(NO WILLFUL CONDUCT)**

16     144.    Plaintiffs' claims for enhanced damages and an award of fees and costs against

17  Fusion Garage have no basis in fact or law and should be denied.

18

**<u>PRAYER FOR RELIEF</u>**

19     WHEREFORE, Fusion Garage respectfully requests the following relief:

20     1.    Judgment in favor of Fusion Garage and against Plaintiffs on all of Plaintiffs'

21  claims asserted in the Amended Complaint;

22     2.    That the Court grant Fusion Garage an award for reasonable attorneys' fees and

23  costs of suit incurred herein; and,

24

25

26

27

28

1        3.        That the Court award Fusion Garage such other and further relief as the Court

2    deems just and proper.

3

4    DATED:  April 14, 2011                    QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
5

6
                                        By _____/s/  Thomas R. Watson_____
7                                            Thomas Watson
                                             Attorneys for Defendant and Counterclaimant
8                                            Fusion Garage PTE Ltd.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2          Fusion Garage hereby demands a jury trial as to all such triable issues in this action.

3

4     DATED:  April 14, 2011                QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
5

6                                           By      /s/  Thomas R. Watson
7                                              Thomas R. Watson
                                               Attorneys for Defendant and Counterclaimant
8                                              Fusion Garage PTE Ltd.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**From:**          Alysia
**Sent:**          Monday, August 25, 2008 06:21 PM
**To:**          Michael Arrington
**CC:**          Nik Cubrilovic; Heather Harde
**Subject:**       Re: Latitude XT for screen part

Couldn't get exact cost from this guy. But will get it from him first thing tomorrow morning (they're in TX so it'll be early). I agree, it's silly for them to not give info when they're trying to sell parts.

Don't trash them yet. I get the feeling this guy was a bit of a barrier -- but the company and screen look pretty cool. Let me try some things.

AA


On Mon, Aug 25, 2008 at 6:12 PM, Michael Arrington <marrington@gmail.com> wrote:

fuck that, bulldoze around this problem. find out who their investors are. get their head to where via is. if they don't move, screw it, move on.

also, what is the exact cost? above $100 isn't a problem, above $150 is.

i may just trash them on techcrunch. dicks.




On Aug 25, 2008, at 6:10 PM, Alysia wrote:

They won't even send us a display w/out signing an NDA. I think Cameron found one for $1000 on ebay.

When he sends the NDA, I'd like to have a mtg w/you, Michael, Nik and the founder/CEO of this company. The sales guy is a barrier who is process driven, and we need to get to the decision maker.

Also, the sales guy warned me that the screens at 12.1" are >$100 for mfcts cost.

Cameron cannot order until he has an okay from Heather -- that was what I told him.

- AA

On Mon, Aug 25, 2008 at 5:35 PM, Michael Arrington <editor@techcrunch.com> wrote:

Aren't these $2500? Won't ntrig send us one?

Sent from my iPhone

On Aug 25, 2008, at 4:26 PM, Alysia <alysiaa@gmail.com> wrote:


Hi Cameron,

Thanks for your help. Please check with Heather, but order a Dell Latitude XT so we can cannibalize the screen for our prototype. Here's a link to an article about the XT we want to order:

http://www.nytimes.com/2008/08/24/technology/24proto.html?_r=1&partner=rssnyt&emc=rss&oref=slogin

Confidential                                       

Please order a refurbished one if you can as they work and are considerably less expensive. Expedite
shipping if possible to overnight or next day.

Thanks!
Alysia

Confidential                                                                                    TC00005520

# EXHIBIT B

| | |
|---|---|
| **From:** | <brian@techcrunch.com> |
| **To:** | Michael Arrington <editor@techcrunch.com> |
| **CC:** | Nik Cubrilovic <nik@techcrunch.com>; Heather Harde <heather@techcrunch.com> |
| **Sent:** | 8/31/2009 1:52:59 AM |
| **Subject:** | Re: Update on Pegatron |

Pegatron got back to me... twice.

1st call:
They mentioned that they are not able to do this without the upfront NRE. Mentioned that decision is at the CEO level. Mentioned that at the time the agreement was made FG told them they needed 24 hours to confirm the upfront NRE change in order to get agreement from TC. 24 hours later, FG told Peg that all were in agreement on changing to up front NRE assuring Peg that TC was in agreement. They mentioned several times that FG was going to keep driving the product and they repeatedly asked if TC was OK with Peg continuing to work with FG to get it done. 4 times they asked to be exact. It seemed like they were aware that there was a possibility that TC would continue to cooperate with them continuing to work with FG. I strongly sense that is a conversation that happened.Each time I told them that Michael was feeling very betrayed and that I would need to communicate the conversation to him. In the end, he mentioned that they understand that this is a TC idea and that TC owns CP and that if TC wants them to back away from FG, they will do so at TCs request. <mark>They are obviously hoping that this stance will keep the negative guns pointed away from them.</mark>

2nd call, 15 minutes later:
They asked how we would like to them to continue interfacing with FG. I told them to conduct business as usual until I get a chance to sync with Michael and that I would call once I've done so.

Need to determine next steps. I suspect that BBY will not be able to help unless they are willing to pay the NRE. Peg does not care who pays them, <mark>but they most certainly do not like being in Michael's cross-hair and are willing to walk away and versus taking on negative press or additional financial risk</mark>. I would not be surprised if Peg would quietly waive the NRE on the back end to FG in exchange for ownership if TC were to continue pushing MKTG efforts and those efforts were positive. Could push to get the samples for TC50 to gauge response in advance of paying any NRE. This will strengthen FG hold on the product, but would open the door to alternate design for production if that path is to be pursued.

-----Original Message-----
From: "Michael Arrington" <editor@techcrunch.com>
Sent: Sunday, August 30. 2009 5:48am
To: brian@techcrunch.com
Cc: Nik Cubrilovic <nik@techcrunch.com>. "Heather Harde" <heather@techcrunch.com>
Subject: Re: Update on Pegatron

fingers crossed.

On Aug 30, 2009, at 3:46 AM. brian@techcrunch.com wrote:

Just finished final conversation with Peg. Message on positive communication to globe with Peg executives involved with TC50 versus negative communication with shutdown of project received 14.5 hours prior to internal management meeting... Let us see how it is received.

-----Original Message-----
From: brian@techcrunch.com
Sent: Friday, August 28, 2009 12:24pm
To: "Nik Cubrilovic" <nik@techcrunch.com>
Cc: "Michael Arrington" <editor@techcrunch.com>, "Heather Harde" <heather@techcrunch.com>
Subject: Re: Update on Pegatron



Yes, and when I also mentioned that I thought FG was attempting to skim off the top based on their unwillingness to share data and the large numbers they were verbally mentioning, I was certain that to be the case. When I discovered their initial BOM cost to me, which they would never email to me, was higher than that emailed direct from Peg, it was most gratifying to slam their fingers in the lid of the cookie jar. They were obviously planning on pocketing $20-$30/unit at the time they announced the $400 price to the world. Every cockroach involuntarily scrambles when the light comes on!

The lesson for the day on the HW/MFG business is only work with people that you trust! It is just too easy to skim as all partners

CONFIDENTIAL

want additional profits and there are too many places to hide $$. Always assume the worst, especially when times are good, and you will never be surprised or stop hunting for it.

Not out of the woods with Peg yet... but slightly better outlook than 48 hours ago. I'll hold off celebrating until the final word is back from them.

-----Original Message-----
From: "Nik Cubrilovic" <nik@techcrunch.com>
Sent: Friday, August 28, 2009 2:09am
To: brian@techcrunch.com
Cc: "Michael Arrington" <editor@techcrunch.com>, "Heather Harde" <heather@techcrunch.com>
Subject: Re: Update on Pegatron

adding heather as well

On Fri, Aug 28, 2009 at 2:08 AM, Nik Cubrilovic<nik@techcrunch.com> wrote:
> I am taking this as being positive, because from their perspective
> they could have cut us out 24 hours ago, and it seems that they are
> going through a very deliberate internal process of figuring out what
> to do, and the questions he asks tend to lead to them going with us.
>
> For them it comes down now to internal problems and a project to work
> on, or much bigger external problems and no project
>
> Once you narrow it down, almost a no brainer - but I see how they are
> searching for an alternate escape hatch at the moment (ie. they know
> they have to go with us, just checking one last time incase there is a
> way out). I can imagine that they have been speaking to Chandra as
> well during this period, or might have enough already to know that FG
> can not carry this on their own
>
> The thing that surprises me Brian is that we are getting pretty good
> at knowing the Asian playbook. Remember the initial convo about out
> peg approach we had in Singapore? It played out almost exactly the way
> we expected it - I am thinking it might play out the same way here
> again (ie. they will come back with 'yes lets do 1000 with you now')
>
> nik
>
> On Fri, Aug 28, 2009 at 2:01 AM, <brian@techcrunch.com> wrote:
>> 2.5 hour marathon call with Peg just finished, and we are still expecting a
>> call on Sunday with the final answer. I did not respond to the email from
>> them and there were 2 urgent voice-mails on my cell before I responded and
>> apologized for being busy... on purpose.
>>
>> Call &A summary:
>> If Peg chooses Techcrunch Option is NRE truly $0? I reiterated that we
>> needed to get back the original deal which was NRE amortized over production
>> volume and time. He knows that was the original structure and it would
>> weaken our position if we insist on changing from the original to $0.
>>
>> Could NRE be amortized over 100K units? I responded that adding $7 to the
>> cost of the initial 100K units would not work and that it will need to be a
>> sliding scale based on volumes predicted by the pre-sale 1K units. The
>> sliding scale would guarantee that the product would not be burdened up
>> front with payment larger penalties as that would be counter-intuitive to
>> building and nurturing a successful business. I told him that expectations
>> were set with us that the NRE recovery would not exceed 3 years of
>> production volume. The sliding scale allows us to minimize payments in the
>> beginning when volumes are low resulting in the least impact to per unit
>> cost adder. He understood.
>>
>> If they chose the FG path would TC give them a letter stating that we were
>> no longer involved? I told him that the hail storm of negative press would
>> make it obvious to the world that we were no longer involved and that his

>> without us is pointless. I expect them to somehow work out going back
>> to the old scenario, only communicating with us directly from now and
>> cutting FG out of that loop.
>>
>> how the hell they believed Chandra would sell 1M units without us, I
>> will never know.
>>
>> On Thu, Aug 27, 2009 at 2:54 AM, <brian@techcrunch.com> wrote:
>>> I did communicate to Pegatron as we discussed yesterday in detail. Here
>>> is
>>> the summary of that conversation:
>>>
>>> We will get their final answer late Sunday/early Monday our time. He
>>> communicated he though it would be a no go for his MGMNT to change back to
>>> initial terms, but was not 100% comfortable. We shall see. Details below
>>> show tone and flow.
>>>
>>> Here are those details:
>>>
>>> I communicated to Leo the fact that Techcrunch is now feeling like the
>>> terms
>>> are changing at the end of the project as we have been communicating the
>>> need from the start of the project that there would be no NRE up front and
>>> that we would build the initial 1K units to test the Market with. I also
>>> communicated that expectations were set to TC that these terms were agreed
>>> to and not a problem. I told him that there was anger and resentment on
>>> our
>>> side based on terms changing at the end. I explained very clearly that if
>>> the initial understanding of the agreement that was communicated to us, no
>>> up front NRE and 1K units for pre-sale, was not met that TC would be
>>> forced
>>> to shut support for the project down.
>>>
>>> He mentioned that FG did tell them that TCs expectation was to test the
>>> market with 1K units but that Chandra was comfortable committing to the 1M
>>> unit annual sales based on the all of the other customers he had. I again
>>> mentioned that almost all the customers at the table were brought to the
>>> table by and interested in partnering with TC on the TC Crunchpad based on
>>> public feedback to the initial articles. I reiterated that at no time was
>>> a
>>> 1M unit annual volume communicated as a required term to TC and that it
>>> would contradict the need for 1K pre-sale units for Market testing.
>>>
>>> He continued to refer to discussions and agreements made with Fusion
>>> Garage
>>> and I continued to explain that Techcrunch is feeling surprised at the end
>>> of the project. He eventually got the fact that TC was not being kept in
>>> the loop with communications and is just now starting to get an
>>> understanding with the MOU terms being recently released to us. He then
>>> started referring to the 2 scenarios. The original, which is expectations
>>> set with TC, and the current which is completely changed and agreed to by
>>> FG
>>> and Peg. He told me that his management would not support going back to
>>> the
>>> original scenario. I told him that I would instruct Michael that Peg does
>>> not agree to work with TC on the original scenario terms thus forcing a
>>> shut
>>> down. He then asked until our Sunday, their Monday to get final feedback
>>> from his management team as they were at an off-site.
>>>
>>> I mentioned that if they did decide to work on the original scenario terms
>>> that all of the partners that TC brought to the table, including Best Buy
>>> would continue to back the project with the extreme vigor shown to date
>>> and
>>> that the TC marketing engine would fuel great positive coverage globally.

CONFIDENTIAL

TCR000560

>> management team would know clearly from that global press exactly where we
>> stood.  I also mentioned that the ripple effect of the negative press would
>> drive all of the larger volume partners we brought to the mix away.  He
>> asked would there be any negative press towards Pegatron.  I told him that
>> the sense of betrayal was the strongest I have ever seen that there is pure
>> anger where a strong sense of partnership used to be.  I mentioned that they
>> should assume so but that I argued for one chance to try to fix it before
>> shutting it down and educating the world why we are doing so.  Michael, you
>> are now the angry guy and I am trying to help them stay off your radar
>> screen.  He asked if I would please tell you that they have been consistent
>> in their stance and that FG was not communicating properly.  I told him that
>> I would do so but that deceit was different than poor communication of
>> course he implied I meant on FG's behalf.
>>
>> What would happen to FG if they chose the TC option?  I told him that the
>> changes were already in play referring to the fact that KS and Stuart have
>> already transitioned to reporting to me.  He asked FG could drive the
>> project if TC backed out.  I told him his finance department already had the
>> answer to the questions and it was moot.  He obviously got it.  He stated
>> they are worried about a repeat situation where FG makes a commitment and it
>> causes turmoil.  I told him that if the answer if to stick with FG, we will
>> shut it down and they would need to rely on FG and mentioned the negative
>> press again.  If they want to support TC, they will only interface with TC
>> on any business operation related topics and reinforced that FG would not
>> have the authority to make any binding commitments.
>>
>> Are there any other issues?  I told him that we would expect them to
>> continue to drive cost reductions on the areas of the BOM they can impact,
>> that we expect to verify and impact the tooling costs, and that we needed to
>> have protos for TC50.
>>
>> Would they be held responsible for the $299 street price if Intel and
>> Display combo did not come through?  I told him that we would not hold
>> Pegatron responsible for costs out of their control.  He asked if we had
>> gotten reductions there.  I told him that we are in conversations with the
>> top executives of the major cost centers and that we were confident that we
>> will get close enough to our cost targets that we would avoid major public
>> outcry but that we would obviously not be able to take a profit on the HW.
>> He asked if we backed out would we share the pricing with FG.  I told him
>> that he knew very well that, contractually, the vendors would not allow me
>> to share our TC pricing with them.  Again with the chuckle...  He was
>> testing me.
>>
>> BTW, I am not starting price discussions with component vendors until they
>> indicate conformance as it would be pointless to beat the vendors then shut
>> it down if they were to comply.
>>
>> He mentioned that the biggest issue is one of saving face.  Since the head
>> of the BU communicated that they had changed the NRE to up front to
>> eliminate the risk, they will look like clowns if they change it now.  I
>> told him that I understood, but I would prefer internal strife to this type
>> of potential external strife.
>>
>> Losing face is tough for them culturally, let's see what happens...  Next
>> update late Sunday.
>>
>>
>> -----Original Message-----
>> From: "Nik Cubrilovic" <nik@techcrunch.com>
>> Sent: Thursday, August 27, 2009 9:34am
>> To: brian@techcrunch.com
>> Cc: "Michael Arrington" <editor@techcrunch.com>
>> Subject: Re: Update on Pegatron
>>
>> You can see from his questions that they recognize that following FG

>>> I
>>> added that TC/Crunchpad Inc would be the entity that they would interface
>>> with.  However, if they say no forcing a shut down, TC would need to begin
>>> to craft the final communications on the project to the public and get
>>> prepared for the negative onslaught.  A lot of uh huhs on the other end of
>>> the phone as he took notes.  I explained that with TC50 so close that we
>>> needed time to craft the communications so getting us their final feedback
>>> by Monday their time was critical.
>>>
>>> He then checked with the EA to confirm the MGMNT team would be back in the
>>> office Monday morning and agreed to the time again.  He mentioned again
>>> that
>>> he thought they would say no.  I then told him that I would then change my
>>> communication back to Michael and instead of an immediate shut down that
>>> Pegatron would most likely not agree to the original scenario terms most
>>> likely forcing a shut down, but the final decision would come late our
>>> Sunday.  Again he was not very comfortable at all in that position.
>>>
>>> He asked what would happen if we withdrew our support, and would they then
>>> work with just FG and how FG would manage to get the product out without
>>> TC
>>> support.  Before I could answer he quickly asked another if TC would still
>>> be acquiring FG.  I told him that if they force a shutdown, FG would have
>>> to
>>> secure funding on their own to fund Marketing activities and to pay Peg
>>> the
>>> monies they called out in the second scenario to support the 1M units
>>> volume
>>> for which TC was not aware of and that TC would not be involved in the
>>> process.  He mentioned that this would likely damage relationships.
>>>
>>> He mentioned that he would talk to FG about this and I told him that TC
>>> communicated its position to FG and that they were aware.  I told him that
>>> were are consistent in our communication.
>>>
>>> He then told me that he understood completely and had no more questions.
>>> We
>>> agreed that we would talk again our Sunday.
>>>
>>>
>>>
>>
>

TC00000561

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


INTERSERVE, INC., dba TECHCRUNCH,
a Delaware corporation, and
CRUNCHPAD, INC., a Delaware
Corporation,

          Plaintiffs,

     vs.                           No. CV-09-5812 RS (PVT)

FUSION GARAGE PTE, LTD., a
Singapore company,

          Defendant.

_____


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF HEATHER A. HARDE

Redwood Shores, California

Wednesday, August 11, 2010




Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Job No. 140501

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
2                        SAN FRANCISCO DIVISION

3


4    INTERSERVE, INC., dba TECHCRUNCH,
     a Delaware corporation, and
5    CRUNCHPAD, INC., a Delaware
     Corporation,
6
                    Plaintiffs,
7
          vs.                           No. CV-09-5812 RS (PVT)
8
     FUSION GARAGE PTE, LTD., a
9    Singapore company,

10                  Defendant.

11

12   _____

13

14

15        Highly Confidential, Videotaped Deposition of

16   HEATHER A. HARDE, taken on behalf of Defendant Fusion

17   Garage PTE, LTD, at 555 Twin Dolphin Drive, 5th

18   Floor, Redwood Shores, California, beginning at 9:22

19   a.m. and ending at 6:12 p.m., on Wednesday, August

20   11, 2010, before SUZANNE F. BOSCHETTI, Certified

21   Shorthand Reporter No. 5111.

22

23

24

25

2

1    BY MR. STERN:

2         Q.  This is an email -- it's entitled "fuck"

3    from Mr. Arrington.  I don't even know who it's to.

4    It says:

5              "Do you realize how delicately I've

6         handled press?  I refrain from talking

7         about it on Charlie Rose.  Then you

8         give everything we have to a Singapore

9         newspaper."

10             And then I think -- I don't know who that's

11   to.  Do you know who that's to?

12             MR. BRIDGES:  Objection.  Lacks foundation.

13             THE WITNESS:  I don't know who that's to.

14   BY MR. STERN:

15        Q.  And then Mr. Arrington sends an email, it

16   looks like to himself, copied to Chandra, copied to

17   somebody named bk@duzzit.com, copied to you.  Who's

18   bk@duzzit.com?

19        A.  That's the email address for Brian Kindle.

20        Q.  Okay.  And then it says:

21             "You tell the press what you think

22        the price is?  What the hell."

23             Right?

24             Now, Mr. -- Mr. Arrington had published in

25   his very first blogs about the product what he

1    thought the price point of the product was going to

2    be, didn't he?

3         A.  He -- if I recall his post correctly, there

4    was a vision for what he wanted the price to be less

5    than.

6         Q.  And what was that price?

7         A.  I think it was $200.

8         Q.  Have you ever -- you're under oath, so I can

9    ask you this.  Have you ever come up to the

10   conclusion that you thought that Mr. Arrington was

11   arrogant?

12          MR. BRIDGES:  Objection.  Irrelevant.  Calls

13   for opinion.

14          THE WITNESS:  No.

15          MR. BRIDGES:  Vague and ambiguous.

16   BY MR. STERN:

17      Q.  You don't believe that Mr. -- have you ever

18   come up with the opinion that Mr. Arrington has a

19   temper?

20          MR. BRIDGES:  Objection.  Vague and

21   ambiguous.  Same -- and other same objections.

22      THE WITNESS:  Yes.

23   BY MR. STERN:

24      Q.  Have you ever been the object of that

25   temper?

                                                        334

1        MR. BRIDGES:  Objection.  Vague and

2   ambiguous.  Lacks foundation.

3        THE WITNESS:  Yes.

4   BY MR. STERN:

5        Q.  Have you ever heard Mr. Arrington being

6   described as a bully?

7        A.  I don't know if I've heard that.

8        Q.  It was after this event on July 30th, 2009,

9   when Mr. Rathakrishnan talked to the Singapore press

10  about the product in development that Mr. Arrington

11  decided to sic Brian Kindle and Nik Cubrilovic to go

12  to Singapore, right?

13        MR. BRIDGES:  Objection.  Argumentative.

14  Lacks foundation.

15  BY MR. STERN:

16        Q.  That's the question the jury is going to

17  hear.

18        MR. BRIDGES:  Please let me finish my

19  objections.  All right?  So -- so can you please --

20  or I'll continue the objections.  Argumentative.

21  Lacks foundation.  Vague and ambiguous.  Go ahead.

22        THE WITNESS:  I can't agree with your

23  characterization of "sic."

24  BY MR. STERN:

25        Q.  All right.  How about this.  It was after

# EXHIBIT D

Michael Arrington
Highly Confidential - Attorneys' Eyes Only

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

INTERSERVE, INC., dba              )

TECHCRUNCH, a Delaware             )

corporation, and CRUNCHPAD,        )

INC., a Delaware                   )

corporation,                       )

                Plaintiffs,  )

vs.                                )No. 09-CV-5812 RS

FUSION GARAGE PTE. LTD, a          )

Singapore company,                 )

                Defendant.   )

-------------------------------


VIDEOTAPED DEPOSITION OF

INTERSERVE, INC. dba TECHCRUNCH

MICHAEL ARRINGTON

Redwood Shores, California

Tuesday, April 20, 2010

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY




REPORTED BY:


JAY W. HARBIDGE, CSR NO. 4090

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

```
 1              UNITED STATES DISTRICT COURT

 2      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

 3      INTERSERVE, INC., dba          )

 4      TECHCRUNCH, a Delaware         )

 5      corporation, and CRUNCHPAD,    )

 6      INC., a Delaware               )

 7      corporation,                   )

 8                      Plaintiffs,    )

 9      vs.                            ) No. 09-CV-5812 RS

10      FUSION GARAGE PTE. LTD, a      )

11      Singapore company,             )

12                      Defendant.     )

13      ------------------------------

14

15              Deposition of MICHAEL ARRINGTON, taken

16              on behalf of Defendant at Quinn,

17              Emanuel, Urquhart, Oliver & Hedges,

18              LLP, 555 Twin Dolphin Drive, Suite

19              560, Redwood Shores, California 94065,

20              beginning at 10:08 a.m. and ending at

21              7:15 p.m., on Tuesday, April 20, 2010,

22              before Jay W. Harbidge, CSR No. 4090.

23

24

25
```

2

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

```
1     were CrunchPad, TechCrunch and Fusion Garage; is

2     that correct?

3           A.    Yeah.  It might have been more informal,

4     or me and Chandra, for example, but yes.

5           Q.    Well, was the agreement between Michael

6     Arrington individually and Chandra Rathakrishnan

7     individually or was it between --

8           A.    No.

9           Q.    I'm sorry?

10          A.    No.

11          Q.    It wasn't an individual agreement

12    between individuals, correct?

13          A.    Correct.

14          Q.    It was an agreement between entities,

15    and those were CrunchPad and TechCrunch on the one

16    hand and Fusion Garage on the other; is that

17    correct?

18          A.    Yes.

19          Q.    Okay.  So this was not an agreement only

20    between CrunchPad and Fusion Garage, correct?

21          A.    Correct.

22          Q.    Okay.  And can you tell me the date that

23    the parties reached this agreement?

24                MR. BRIDGES:  Objection, vague and

25    ambiguous, may call for a legal conclusion.
```

84

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

 1              THE WITNESS:  The first meeting I had

 2     with Chandra was, I believe, in -- I believe in

 3     October, although there's some email evidence to

 4     nail the date down.  At that meeting, we, Chandra

 5     and I, agreed that the only way to work together was

 6     a merger of the entities.

 7              In particular, I was concerned -- excuse

 8     me -- I was concerned that -- Fusion Garage had a

 9     different product that they were in the middle of

10     creating and that our partner needed to be

11     completely focused on the CrunchPad project.  And he

12     agreed that that was a concern.

13              And so at that meeting we agreed that we

14     needed to combine these entities to make sure that

15     we were all working towards one goal and the same

16     goal.  That arrangement, that agreement, never

17     changed until November of 2009.

18     BY MR. STERN:

19          Q.   Okay.  Move to strike.  That was not my

20     question.

21              My question was, the specific agreement

22     referred to in the last sentence of paragraph 31 on

23     page 6 where, again, you say that the parties

24     agreed, quote, "that each would bear its own losses

25     of time, energy and money if the project was not

                                                          85

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1    successful, and to share the profits if it was,"

2    close quote, when was that agreement reached?  And

3    I'm looking for a date.

4              MR. BRIDGES:  Objection, vague and

5    ambiguous, asked and answered.

6              THE WITNESS:  The problem was that

7    Fusion Garage had a messy cap table, and that was

8    the primary reason why we didn't combine the

9    companies, the assets, right from the start.

10             In the meantime, while Chandra was

11   working to clean up his cap table, we had a general

12   working relationship where he would continue to pay

13   in particular payroll for the Fusion Garage

14   employees and many of the expenses that went to

15   third parties.  We would cover some of them in

16   particular when they needed the money.

17             That was an ongoing relationship that we

18   operated under the entire time while working towards

19   merging the entities.

20   BY MR. STERN:

21       Q.   Okay.  But my question was -- again,

22   moving to strike what you just said, my question

23   was -- I'm looking for a date -- can you tell me the

24   date that you and anybody on behalf of Fusion Garage

25   reached an agreement where each of the parties,

86

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1   A.   Fusion Garage for the entire year was

2   just -- they would have bouts of quiet and we said,

3   you know, "Chandra, you've got to talk to me.  If

4   things are going wrong, talk to me.  Let me know

5   what's going on."

6   Q.   You felt they weren't forthcoming with

7   you about the hardware?

8   A.   About everything sometimes.  That's why

9   Brian and Nik were sent out there because of Chandra

10  not getting enough information for me.  These guys

11  need to go out on there, and Chandra said okay.

12  Q.   When your people went to visit Pegatron,

13  did you hear that they learned that Pegatron was not

14  prepared to provide the hardware on the terms that

15  you understood they were going to be providing them?

16  MR. BRIDGES:  Objection, vague and

17  ambiguous.

18  THE WITNESS:  My understanding from

19  Brian was that we were in the ballpark on the

20  hardware, that the BOM looked in the ball bark of

21  doable.

22  There was some concern about Pegatron

23  seeming to not know who they were or that we were

24  even part of the project.  There was something about

25  of being a customer of the project.  It's in the

279

1       document.

2                     But that led to some concern at the time

3       that maybe something was going on.  I talked to

4       Chandra about it.  He said, "Everything's fine."

5       BY MR. STERN:

6             Q.   You mean you heard that CrunchPad was a

7       customer of their products?

8             A.   There was some discussion of that.  I'm

9       hearing this thirdhand now through Brian, but yes.

10            Q.   But that led you to believe that somehow

11      Fusion Garage was not recognizing CrunchPad as a

12      partner but rather just seeing them as a purchaser

13      of the product?

14                    MR. BRIDGES:  Objection, competence,

15      vague and ambiguous.

16      BY MR. STERN:

17            Q.   First of all, let me ask you --

18                    MR. BRIDGES:  By the way, Mr. Stern,

19      let's do about two more minutes and then take a

20      break.  It's been over an hour.

21      BY MR. STERN:

22            Q.   Can you tell me, what are you aware of

23      Fusion Garage's current funding?

24                    MR. BRIDGES:  Objection, vague and

25      ambiguous.

                                                      280

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1               THE WITNESS:  What I read in the press.

2       That's about it.

3       BY MR. STERN:

4           Q.   What do you read in the press?

5           A.   They said they raised, I think, a $2

6       million round.  And then I think they said we have

7       another big round coming.  But, again, I don't know.

8       That's about all I know about it.

9           Q.   Did you ever raise a $2 million round

10      for the acquisition of Fusion Garage?

11              MR. BRIDGES:  Objection, vague and

12      ambiguous.

13              THE WITNESS:  We never closed on the

14      round that was offered.

15      BY MR. STERN:

16          Q.   Who offered the money?

17          A.   In the term sheet it was First Round

18      Capital, SoftTech VC.  Ron Conway I think had signed

19      up, maybe not formally, and they were going to put

20      together the rest of the round as needed.

21          Q.   Do you remember what the total round was

22      going to be?

23          A.   We were targeting a couple of million

24      dollars, $2.

25          Q.   But that round never closed; is that

                                                    281

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1      correct?

2              A.   Correct.

3              Q.   Even though you say it never closed,

4      what do you mean by that -- there was no paper on

5      the deal?

6              A.   They sent us a term sheet by email.

7              Q.   Did you sign it?

8              A.   It's not customary to sign the term

9      sheet, so no.

10             Q.   Let me see if I get this straight.  It's

11     your sworn testimony that in Silicon Valley it's not

12     customary to sign term sheets; is that right?

13             A.   It's my belief that, particularly around

14     financing, that signing of term sheets is actually

15     pretty rare, yes.

16                  MR. BRIDGES:  We've gone a couple of

17     minutes.  Let's take a break now.

18                  THE VIDEOGRAPHER:  We are off the record

19     at 4:26 p.m.

20                  (Brief recess.)

21                  THE VIDEOGRAPHER:  We're back on the

22     record at 4:47 p.m.

23     BY MR. STERN:

24                  MR. STERN:  Next exhibit.

25     //

                                                      282

**Michael Arrington**
**Highly Confidential - Attorneys' Eyes Only**

```
1              same number that two months later, if you look at

2              Exhibit 8, Exhibit 8 --

3                      A.   Yes.

4                      Q.   -- if you look at the cap table for

5              Exhibit 8, it talks about $2 million being invested.

6              Do you see that?

7                      A.   Yes.

8                      Q.   Are you with me on that?

9                      A.   Yes.

10                     Q.   And it's also on October 26th, Exhibit

11             11.

12                     A.   Yes.

13                     Q.   Do you have it there?

14                     A.   Probably.

15                     Q.   Yes.  Exhibit 11, if you look at the cap

16             table, it also talks about raising $2 million,

17             right?

18                     A.   Yes.

19                     Q.   So I've showed you three pieces of paper

20             that span from June 2009 to November of 2009.  All

21             those pieces of paper show it raising capital of $2

22             million, right?

23                     A.   Yes.

24                     Q.   So I just want to make sure.  It was

25             your understanding repeatedly to these various
```

                                                                    315

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1    different documents and communications with all

2    sorts of different people that $2 million was the

3    amount of cash that you needed to -- and I want to

4    use your language -- to be able to do production of

5    the CrunchPad device up to 1,000 units.  Is that

6    what you said?

7              MR. BRIDGES:  Objection, misstates

8    testimony.

9              THE WITNESS:  $2 million seemed to be

10   roughly the amount needed to get to the point where

11   we could start producing CrunchPads.

12   BY MR. STERN:

13        Q.   Okay, all right.  Now, you testified

14   that you understand that my client has raised how

15   much money?

16        A.   This is based on what I'm reading in the

17   press.

18        Q.   Yes.

19        A.   That he said he had raised a couple of

20   million dollars.

21        Q.   Did you also read in the press that in

22   addition to the couple of million dollars he's

23   already raised, there's also additional funding

24   that's coming in?

25        A.   I read something about him saying there

316

**Michael Arrington**
**Highly Confidential - Attorneys' Eyes Only**

```
 1        was a substantial amount of funding coming at some

 2        point this year.

 3             Q.   Can you please tell me what facts you're

 4        aware of that suggest that with a couple million

 5        dollars, my client, Fusion Garage, can't do what you

 6        believed CrunchPad could do between June and

 7        November of 2009, namely, bring to market a web

 8        tablet?

 9             MR. BRIDGES:  Objection, vague and

10        ambiguous, assumes facts not in evidence.

11             THE WITNESS:  There were a number of

12        factors involved in us getting the CrunchPad to

13        market.  A key relationship was going to be Best

14        Buy.  Getting a device through FCC clearance,

15        getting the tooling done, getting the basic stuff

16        made, that's going to cost a certain amount of

17        money.  We estimated that at $1.1 and $1.2 million,

18        something like that.

19             Actually getting devices product is

20        expensive.  You're looking at a BOM, a bill of

21        materials, of $300, around there.  You also need to

22        think about shipping costs.  And you also need to

23        think about cash flow.  When we talked to Best Buy,

24        we were talking about placing orders of thousands of

25        units at a time.  That simply puts the company out
```

317

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1          THE WITNESS:  Nothing more than the

2     discussions that I have had over the last year with

3     them.

4     BY MR. STERN:

5          Q.   Can you tell me as many details as you

6     can, and I understand that you said that -- withdraw

7     that.  Let me start over.

8               Everything you know about Fusion Garage's

9     financing is what you've read in the press, right?

10              MR. BRIDGES:  Objection, misstates the

11    testimony.

12              THE WITNESS:  No.

13    BY MR. STERN:

14         Q.   What else do you know?

15         A.   Well, I know what Chandra told me

16    directly before the relationship dissolved.

17         Q.   Then let's break it down.  Other than

18    what Mr. Rahthakrishnan told you and what you read

19    in the press, are there any other sources of the

20    financing that Fusion Garage has?

21         A.   No.

22         Q.   Okay.  So let's first talk about what

23    you read in the press.  Tell me everything that you

24    know about any monies that are available to Fusion

25    Garage with respect to the JooJoo product based on

1       what you read in the press?

2                   A.    If I remember correctly --

3                   MR. BRIDGES:  Okay.  Objection, lacks

4       competence.

5                   THE WITNESS:  If I remember correctly,

6       there were statements in the press about him closing

7       the $2 million in funding early on when he was

8       announcing the product.  He also, I believe, made

9       statements around a Malaysian partner who was going

10      to -- I don't think he made statements they were

11      investing in it; I think they were going to help him

12      with production costs.  Again, vague statements, I'm

13      not really sure.

14                  He also made statements to the press, I

15      believe, that he had raised a substantial new round

16      of funding that would be announced in a couple of

17      weeks.  I believe those statements were made in

18      January, maybe February, January, something like

19      that, maybe even earlier.  And as far as I know,

20      that has never been announced.  That's all that I

21      have heard.

22      BY MR. STERN:

23          Q.    Anything else?  Like can you give me any

24      details about any of those things?

25          A.    That's basically the sum of everything

                                                        324

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1    I've heard.

2          Q.    See, when witnesses say "basically the

3    sum," I'm thinking they're trying to summarize for

4    me, and I really don't want you to summarize.

5                Is there any greater detail you obtained

6    in the press than that?

7          A.    That's it.

8          Q.    So now, tell me what Mr. Rahthakrishnan

9    told you before the relationship changed.

10         A.    Over the course of the time I knew him,

11   he was always in financial trouble, always

12   hand-to-mouth, having trouble making payroll,

13   according to him, having to fly back to Asia to find

14   new investors, none of whom seemed to be very

15   attractive investors.  A lot of them had just

16   completely different terms every month where they

17   wanted to be repaid, they didn't, and he provided

18   various documents showing different people's names.

19   The key thing was he seemed to be continuing to make

20   payroll and wasn't losing people.

21         Q.    What was the last sentence you said?

22         A.    The key thing was he seemed to be making

23   his payroll.

24         Q.    He seemed to be making his payroll?

25         A.    Yes, sometimes he was late, but his

325

Michael Arrington

**Highly Confidential - Attorneys' Eyes Only**

1          got, the $2 million investors, where are they from?

2          What's your understanding?

3                    A.   I don't know.

4                    Q.   Do you know if they're Asian investors?

5                         MR. BRIDGES:  Objection, foundation.

6                         THE WITNESS:  Yes, I don't know.  The

7          chiropractor, I don't know if he's in Florida or

8          where.  I don't know where these guys are.

9          BY MR. STERN:

10                   Q.   Okay.  Do you have any reason -- have

11         you heard from any source that in fact he didn't get

12         $2 million in funding?

13                        MR. BRIDGES:  Objection, argumentative.

14                        THE WITNESS:  No.

15         BY MR. STERN:

16                   Q.   Have you ever seen any information that

17         the funding he's getting is contingent on any

18         particular event taking place or not taking place?

19                        MR. BRIDGES:  Objection, lacks

20         foundation, vague and ambiguous.

21                        THE WITNESS:  The funding that I've read

22         that he's getting?  I don't believe so.

23         BY MR. STERN:

24                   Q.   Do you have any information as to where

25         within the $2 million funding he's gotten that he's

327

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1     burned through already?

2               MR. BRIDGES:  Objection, foundation.

3     Sorry, vague and ambiguous.

4               THE WITNESS:  I'm sorry, repeat the

5     question.

6     BY MR. STERN:

7          Q.   The question is, do you have any

8     information as to how much of the $2 million

9     Mr. Rahthakrishnan or Fusion Garage has burned

10    through already?

11         A.   I have no direct information.

12         Q.   Do you know if it's $200,000 or

13    $800,000?

14              MR. BRIDGES:  Objection, asked and

15    answered, vague and ambiguous, foundation.

16              THE WITNESS:  Yes, I don't know.  All I

17    know is that the times Chandra talked about coming

18    up with money, it was almost always phantom money.

19    BY MR. STERN:

20         Q.   Do you have any understanding as to when

21    he first received the $2 million in funding?

22              MR. BRIDGES:  Objection, foundation.

23              THE WITNESS:  I don't even have

24    confirmation that he received the $2 million so I

25    don't know.

                                                       328

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

```
 1          BY MR. STERN:
 2              Q.   When did you first read that he did?
 3              A.   I'm not sure I did read that.  I mean,
 4          his email to me said he had it.  I think there
 5          were -- I don't know, post --
 6              Q.   You testified that in the press of the
 7          information you learned, you learned that he had
 8          closed $2 million in funding.  I'm not saying that
 9          it happened; I'm just saying that's what --
10              A.   Yes, I mean, I think I read that.  Maybe
11          he said, "I am closing."  I don't know.
12              Q.   Okay.  You don't know?
13              A.   Yes.
14              Q.   All right.
15                   MR. STERN:  You want to take a break?
16                   MR. BRIDGES:  No.  Let's keep going for
17          a little bit longer.  It's this allergy that kicks
18          up in the afternoon.  That's all.
19          BY MR. STERN:
20              Q.   Was there a period of time during 2009
21          when you stopped focusing on the business of the
22          CrunchPad project?
23                   MR. BRIDGES:  Objection, vague and
24          ambiguous.
25                   THE WITNESS:  Can you be more specific?
```

329

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1        Q.   In general, no.  So let me just make

2    sure we're clear about this.  Can you tell me -- I

3    keep asking, but can you identify -- well, let me

4    change the question.

5              Please identify every contribution that

6    someone from TechCrunch or CrunchPad but not Fusion

7    Garage made to the hardware/software design or other

8    aspects of the CrunchPad.

9              MR. BRIDGES:  Objection, it's asked and

10   answered earlier today, compound, vague and

11   ambiguous.

12   BY MR. STERN:

13       Q.   You testified about some things this

14   morning.  The high-level things.

15       A.   It's virtually impossible to answer the

16   question because it was a collaborative process.  We

17   were all working together.

18       Q.   And that's the best you can give me; is

19   that fair?

20             MR. BRIDGES:  Objection, the question

21   earlier was asked and answered.  It's now -- we're

22   now six hours into the deposition.  He's answering

23   questions you've asked him before.  I'm going to

24   object on the grounds of argumentative, vague and

25   ambiguous.

                                                      337

BY MR. STERN:

    Q.   You can answer the question.  Is that the best you can give me, that it's virtually impossible to answer it?

    A.   That's my answer, yes.

    Q.   Okay.  Can you tell me what contributions anyone from TechCrunch or CrunchPad but not Fusion Garage made to the source code that existed at any point in time for either the CrunchPad or the JooJoo?

    MR. BRIDGES:  Objection, compound, lacks foundation with respect to the JooJoo, vague and ambiguous, and also to a certain extent asked and answered.

    But go ahead.

    THE WITNESS:  One part of that I can answer directly easily is the first prototype of the CrunchPad was designed entirely by Nik on the software side -- hardware with a little bit of help.  But, you know, that was the -- I believe a mostly commercial installation of Linux with some customizing.  That was entirely, though, Nik.

    I believe with prototype B where Louis was involved as well, that's when we moved to mostly Fusion Garage software.  At that point they were

338

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1    taking over.   The actual coding was done by Fusion

2    Garage employees.

3    BY MR. STERN:

4         Q.   Can you tell me any architectural

5    feature of the JooJoo software product that was

6    contributed by anybody associated with TechCrunch or

7    CrunchPad but not Fusion Garage?

8              MR. BRIDGES:  Objection, vague and

9    ambiguous, lacks foundation.

10             THE WITNESS:  I'm not sure what you mean

11   by "architectural."  Do you mean design?  Do you

12   mean --

13   BY MR. STERN:

14        Q.   Yes, yes.

15        A.   Again, I point back to my original post

16   which talked about booting immediately to the

17   browser.  But things like single buttons; camera

18   facing the front.  When you turn the device, it

19   flips the aspect, so you can turn it this way, turn

20   it that way and see differently.  The fact that when

21   you're outside of typing a URL or something else,

22   you don't see the chrome of the browser was

23   something earlier on that we had together agreed was

24   a really good idea.

25             There are examples like that, again, we

339

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1    were doing collaboratively.  A lot of these were at

2    my insistence; some were ideas from other people

3    including Chandra's team.  But, you know, nearly

4    every aspect of it was something I was involved in.

5         Q.   Well, you've now said that a lot of

6    these were at my insistence but some of them were

7    ideas from Chandra.  But that wasn't my question.

8              I keep -- I'm asking for contributions

9    made by people at CrunchPad or TechCrunch but not

10   made by people at Fusion Garage.

11             MR. BRIDGES:  Again, asked and answered

12   from this morning, vague and ambiguous.

13             THE WITNESS:  The point is, you mostly

14   don't keep track.  When you're building things as a

15   team and you're having fun and you're doing it

16   together, you don't keep track of every single

17   little feature.  So you have to go back and look at

18   emails, well, I think I remember saying that, and

19   somebody else remembers the other thing.  The point

20   is, we're doing it together -- in the same offices

21   often.

22   BY MR. STERN:

23        Q.   Let me ask you, when you say single --

24   I'm sorry, booting directly to the browser, have you

25   used the iPad?

340

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1          MR. BRIDGES:  Objection, asked and

2     answered, argumentative, vague and ambiguous.

3          THE WITNESS:  It never occurred to me,

4     which in hindsight, I wish it had.  It would have

5     complicated the situation.  You can imagine that

6     we're working towards a merger and we think we're

7     good to go on the merger.  If you start talking

8     about some other agreement that you're signing and

9     entering into which requires possibly shareholder

10    approval, etcetera, it's just common:  "Why are we

11    doing this?  I though we were working on a merger."

12          I always thought that a merger was just

13    around the corner and we were going to get it done;

14    I really did -- I really did.  I always thought it

15    was just around the corner.  So no, I didn't.

16          MR. BRIDGES:  Let's take a break.

17          MR. STERN:  That's fine.

18          THE VIDEOGRAPHER:  We are off the record

19    at 5:59 p.m.

20          (Brief recess.)

21          THE VIDEOGRAPHER:  We're back on the

22    record at 6:17 p.m.

23    BY MR. STERN:

24          Q.  Can you please tell me everything you

25    know about loans that have been extended by third

348

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1   parties to Fusion Garage.

2       A.   At a high level, I know about Chandra

3   talking about constantly raising small amounts of

4   money mostly to make payroll and some vendor third-

5   party costs.  It's limited to what I know is

6   basically in the emails, and that's really all I

7   know about it.

8       Q.   Do you know anything else other than

9   what you just told me?  Is there any other

10  information you have about the details of loans that

11  have been made to Fusion Garage?

12      A.   Offhand, no.  I would have to refer back

13  to the emails.  In general, it was just there were a

14  lot of people that had loaned money, according to

15  Chandra, and, you know, some of them were happy

16  converting, some of them weren't, so they needed to

17  be paid back.  So our request was that he just get

18  it cleaned up.

19      Q.   Do you know what the status of those

20  loans are today?

21      A.   No.

22      Q.   Do you know many of the loans are

23  outstanding?

24      A.   I don't know.

25      Q.   Do you know how many of the loans have

349

Michael Arrington
**Highly Confidential - Attorneys' Eyes Only**

1          been repaid?

2                    A.    I don't know.

3                    Q.    Do you know if any of the loans are

4          secured?

5                    A.    No.

6                    Q.    Do you know any of the terms of the

7          loans?

8                    A.    There was some discussion of, you know,

9          seven percent per month interest on at least one

10         loan, but that was it.  I never saw any paperwork or

11         anything like that.  I'm not sure there was

12         paperwork around it.  So no, not really.  Just

13         mostly things that Chandra told me in emails that he

14         sent.

15                   Q.    Right now does CrunchPad sell a product?

16                   A.    No.

17                   Q.    Does TechCrunch sell a product?

18                         MR. BRIDGES:  Objection, vague and

19         ambiguous.

20                         THE WITNESS:  I hate to ask.  What do

21         you mean by "sell"?  Like we're in business?

22         BY MR. STERN:

23                   Q.    Do you sell or license a web-based

24         product?

25                         MR. BRIDGES:  Objection, vague and

                                                                350

1    ambiguous.

2    BY MR. STERN:

3        Q.    Well, you mentioned TechBase.

4        A.    We have events we sell tickets to and

5    sell sponsorships to; we have an advertising-

6    supported -- a number of advertising-supported

7    websites; another website, CrunchBase, which is

8    advertising and subscription supported.

9        Q.    Do you sell a web tablet?

10       A.    We do not.

11       Q.    Right now are you in the process of

12   developing a web tablet?

13           MR. BRIDGES:  Objection, vague and

14   ambiguous.

15           THE WITNESS:  We continue to have hopes

16   of doing something in that regard and occasionally

17   have discussions with people around opportunities.

18   BY MR. STERN:

19       Q.    When was the last time that you put

20   together a proposal to any company about developing

21   a web tablet?

22           MR. BRIDGES:  Objection, vague and

23   ambiguous.

24           THE WITNESS:  Would you repeat the

25   question, please?

351

# EXHIBIT E

| | |
|---|---|
| **From:** | 'Heather Harde' <heather@techcrunch.com> |
| **To:** | Chandrasekar Rathakrishnan <chandra@fusiongarage.com> |
| **CC:** | Michael Arrington <editor@techcrunch.com> |
| **Sent:** | 12/18/2008 12:09:24 AM |
| **Attachments:** | FG_LOI_ 121708.doc |
| **Subject:** | LOI |

Chandra,

Thanks so much for your patience this past week.   Your family has been in my thoughts.

Attached for your review is our letter of intent to acquire Fusion Garage.  Please take the necessary time to review our proposal and let us know when you're ready to schedule a follow-up conversation.  We remain extremely enthusiastic about combining forces to create a revolutionary new product for mass distribution, and we look forward to moving the discussion forward at an aggressive pace.  Best regards,

Heather

heather@techcrunch.com



Confidential

FG00001044

**CrunchPad Inc.**
PO Box 638, Menlo Park, CA  94026

December 17, 2008

Fusion Garage
120 Lower Delta Road
#01-16 Cendex Building
Singapore 169208
Attn: Chandrasekar Rathakrishnan, Founder & Chief Executive Officer

Dear Chandra:

This letter (this "Letter of Intent") will confirm the mutual intentions of CrunchPad Inc. ("Purchaser") and Fusion Garage ("Target") regarding the acquisition by Purchaser of the outstanding shares of Target.  It is understood that this Letter of Intent is intended to set forth the fundamentals of the proposed transaction, but that certain aspects of such transaction may be revised and new issues presented upon further investigation.

1.    **Form of Transaction.**  Purchaser proposes to acquire all of the business assets and liabilities of Target by acquiring all of the outstanding shares of capital stock of Target.  The transaction would be structured as a direct purchase by Purchaser from the stockholders of Target ("Selling Stockholders") *provided that*, in the event that Purchaser, in its sole discretion, determines that the transaction would be more efficiently effected by a merger or an asset sale, Purchaser shall have the right to re-structure the transaction as a merger or an asset sale.

2.    **Consideration.**  In consideration of all the outstanding shares of capital stock (including approximately 115,000 options for shares that have yet to be granted to current employees and contractors through the Closing Date) of Target, Purchaser proposes to pay the Selling Stockholders an aggregate purchase price equal to eight (8%) percent of CrunchPad Inc. common stock and to assume the cash balance and up to S$260,000 (Singapore dollars) in third-party indebtedness of Target (the "Purchase Price"). The portion of the purchase price paid to investors of Target shall be vested in full. The portion of the Purchase price paid to the founder and employees of Target shall be subject to vesting as set forth in section 4 of this letter below. The Purchase Price shall be payable by Purchaser on the closing date to be agreed upon by the parties (the "Closing Date.")  The Purchase Price is based upon preliminary due diligence conducted by Purchaser on Target and its business and is subject to adjustment downward, to the extent reasonably agreed upon by Purchaser and Target, in the event that (a) issues discovered in the course of Purchaser's due diligence effort lead to a materially lower valuation of Target's business than the valuation determined based upon Purchaser's due diligence prior to the date hereof, or (b) there is a material adverse change in Target's business, assets, financial condition or prospects following the date hereof (or occurring prior to the date hereof but not disclosed to Purchaser as of the date hereof) (a "Material Adverse Change") or (c) the indebtedness or cash balance of Target changes by more than the historic three-month average burn rate of Target. Purchaser will make good-faith efforts to repay a S$160,000 (Singapore dollars) third-party loan of Target upon the closing a round of financing in excess of $1 million.

3.    **Definitive Agreement.**  The terms and conditions governing the acquisition are, subject to the proviso in Section 1 of this Letter of Intent, to be contained in a stock purchase agreement (the "Stock Purchase Agreement") that shall be subject, in all respects, to the approval of both parties and their respective professional and financial advisors.  The Stock Purchase Agreement shall include, among others, the following terms and conditions:

(a)    Customary representations and warranties made by parties to a stock purchase transaction, including without limitation a representation that Target owns all intellectual property necessary or desirable to develop, manufacture, market and sell its products and services and customary investment representations by the Selling Stockholders;

(b)    Customary conditions to be satisfied before the parties are obligated to close the transaction, including without limitation (i) the approval of the transaction by the boards of directors of both Purchaser and Target; (ii) the approval of the transaction by the stockholders of Target as provided by law; (iii) receipt of all approvals, authorizations and clearances needed from any governmental or regulatory authority or any other person required for consummation of the transaction; (iv) completion of a due diligence investigation of Target by Purchaser and its advisors, to Purchaser's sole satisfaction; (v) delivery of appropriate legal opinions from counsel to Target; (vi) the absence of injunctions and similar restraints; (vii) the accuracy of representations and warranties and performance of covenants; (viii) there shall not have occurred a Material Adverse Change; (ix) each of the warrants, options and other rights to ownership interest or profit participation in Target shall be cancelled or waived, other than the shares of Target being purchased by Purchaser; and (x) the execution of the employment agreements and non-compete agreements referenced herein.

4.    **Key Employees.**  The option grants extended to employees and consultants of Target will be subject to four-year vesting with a one-year initial cliff.  Chandrasekar Rathakrishnan will be offered a role as VP Software & Co-Founder and will report initially to Louis Monier, the Chief Product Officer.  Employees and contractors of Target will report to Rathakrishnan.  Operating and reporting responsibilities will be subject to change to reflect the ongoing businesses needs of Purchaser.

5.    **Due Diligence.**  As soon as practicable after execution of this Letter of Intent, Purchaser, its agents and employees shall be permitted to make a full and complete due diligence review of Target's business and affairs.  Target shall cooperate fully with such review, including providing access to its premises and making available all of Target's documents, employees and agents necessary for Purchaser's due diligence review.

6.    **Indemnification; Setoff.**  Target and the Selling Stockholders shall indemnify Purchaser for any loss, liability or claim, and all costs thereof, incurred in respect of (a) any breach by Target of its representations, warranties or covenants; (b) any failure of Target to perform any of its obligations under the Stock Purchase Agreement; and (c) any claims brought by employees or consultants of Target who were or are terminated prior to the Closing Date. Purchaser shall be entitled to set off any and all amounts under a promissory note to satisfy claims for breaches of representations, warranties and covenants and/or for payment of any other

2

FG00001046

amounts owed hereunder for a period of twenty four (24) months following the Closing Date, subject to certain agreed upon exceptions.

7.    ==No-Shop Provision.==  In consideration of the mutual covenants set forth herein and the willingness of Purchaser to continue its due diligence and consideration of the proposed transaction, Target and the stockholders of Target party hereto agree that, from the date of this letter until the close of business on 60 days from the date hereof (the "No-Shop Period"), they will negotiate a sale of Target exclusively with Purchaser and that neither Target nor any director, officer, employee, stockholder, representative or agent of Target or its subsidiaries (collectively, "representatives") will, directly or indirectly, solicit, initiate, entertain or encourage any proposals or offers of business from any third party relating to any merger or consolidation of Target or its subsidiaries, the dissolution of Target or its subsidiaries or the acquisition of all or a material portion of Target's or any of its subsidiaries' capital stock or assets or any similar transaction, or participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, any such transaction.  Upon execution of this Letter of Intent, Target shall, and shall cause its representatives to, terminate all discussions and negotiations with all third parties relating to any such transaction.

8.    **Confidentiality; Public Announcements.**  Neither party shall, without the prior written consent of the other party, disclose to any third party the existence of this Letter of Intent, the identity of Purchaser or Target or the transactions contemplated by this Letter of Intent.

9.    **Expenses.**  Each party shall be responsible for its own legal, accounting and other fees and expenses related to the transactions contemplated by this Letter of Intent.  Each party shall indemnify and hold harmless the other party from any claim for broker's or finder's fees arising from the transactions contemplated by this Letter of Intent by any person claiming to have been engaged by such party.

10.    **Termination of Letter of Intent.**  The parties will negotiate in good faith to enter into the Stock Purchase Agreement on or before 60 days from the date hereof.  Following the 60 day period, the parties intend this exclusivity provision to continue in full force and effect until such time as either party determines that the parties, after negotiating in good faith, are unable to reach agreement on all material business terms and accordingly wish to terminate this agreement. If the parties fail to enter into the Stock Purchase Agreement on or before such date, the understandings contained in this Letter of Intent shall terminate and be of no further force or effect, except for paragraphs 9, 10 to 12, which shall survive any termination of this Letter of Intent.

11.    **Governing Law.**  This Letter of Intent shall be governed by and construed in accordance with the laws of the State of California, without reference to the conflicts of laws provisions thereof.

12.    **Binding Effect.**  Except for the provisions of paragraphs 5, 7 to 15, inclusive, each of which shall be deemed to be an agreement and binding upon the parties, it is understood that this Letter of Intent does not constitute nor give rise to any legally binding commitment.

Confidential                                                      FG00001047

13.    **Assignability**.  None of the rights of either party hereunder may be assigned, nor may any of the obligations of either party hereunder be delegated, without the prior written consent of the other party; *provided, however*, that Purchaser may assign its rights or delegate its obligations hereunder to any of its affiliates without the prior written consent of Target. This Letter of Intent shall be binding upon and shall inure to the benefit of the respective successors and permitted assigns of the parties hereto to the same extent that it is binding on the parties hereto.

14.    **Amendment; Waiver**.  No amendment, modification or discharge of this Letter of Intent, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought.  No delay or failure at any time on the part of either party in exercising any right, power or privilege under this Letter of Intent, or in enforcing any provision of this Letter of Intent, shall impair any such right, power or privilege, or be construed as a waiver of such provision, or be construed as a waiver of any default or as any acquiescence therein, or shall affect the right of such party thereafter to enforce each and every provision of this Letter of Intent in accordance with its terms.

15.    **Counterparts**.  This Letter of Intent may be executed in one or more counterparts, each of which when so executed and delivered will be deemed an original but all of which will constitute one and the same agreement.

4

Confidential

FG00001048

Please indicate your acceptance and approval of the foregoing statement of our mutual intentions, which intentions are subject in all respects to the execution and delivery of the Stock Purchase Agreement (except for the provisions of paragraphs 5, 7 to 15, inclusive, which shall be binding on both parties).

Sincerely,

**CrunchPad Inc.**

By: _____
Name: J. Michael Arrington
Title:   CEO

Accepted and Approved
as of the date first above written:

**Fusion Garage**

By: _____
Name: Chandrasekar Rathakrishnan
Title:   CEO

Confidential

FG00001049

# EXHIBIT F

**From:**      Michael Arrington
**Sent:**      Tuesday, December 09, 2008 10:29 AM
**To:**        Heather Harde; louis monier
**Subject:**   new OS for netbooks


http://www.techcrunch.com/2008/12/09/netvibes-founder-building-iphone-like-operating-system-for-net-books/
Tariq pitched me on using it for the tablet. It doesn't work for what
we're doing, but it's a cool UI and if FG give us any crap about terms
we should suggest they are our alternative.

CONFIDENTIAL                                                           LM00001115

# EXHIBIT G

**From:**          'Chandrasekar Rathakrishnan' <chandra@fusiongarage.com>
**To:**              Louis Monier <louis.monier@gmail.com>
**Sent:**           11/13/2008 8:21:53 PM
**Subject:**      Re: Trip

hi louis,

i appreciate your transparency and follow-ups. Tech crunch was the primary agenda for the trip. Given developments, i can push back on the rest of the meetings as well and make my trip in early Dec instead.

I agree that the business discussions and options should be discussed prior via call to move things along and to facilitate closure. Who do you think I should be having those conversations with ? Heather/Mike/yourself or a combination of all 3 of you ?

We can progress product discussions as well via skype next week.

On another note just for my information, which stage is the funding process currently at and how close is it to finalization ? The information will help in my own planning :)

Cheers,
c

On Fri, Nov 14, 2008 at 10:23 AM, Louis Monier <louis.monier@gmail.com> wrote:
Chandra, to re-iterate what Heather and Mike said. We can't formalize something with you (as in signed papers) until we close the round of funding. The pressure is on to make it happen now, and Mike and I have to fly to finalize some of the funding things next week (but we don't have dates yet). So, if you plan to come to the Bay Area only to talk to us, you should delay by (hopefully) a couple of weeks (Thanksgiving...). I suggest having all the business discussions ahead of time by phone. Ditto for product discussions, we could make progress next week with a few Skype sessions.

As Heather said, none of this is due to a lack of interest, on the contrary, I want you guys to be part of this, but we need to make things happen in the right order.

Call me if you have any question.

Cheers,
--

  --Louis

Δ π EXHIBIT 24
Deponent Harde
Date 8/11/10 Rptr. SFB
WWW.DEPOBOOK.COM

CONFIDENTIAL

FG0021636

# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

INTERSERVE, INC.,dba          )
TECHCRUNCH, a Delaware        )
corporation, and CRUNCHPAD,   )
INC., a Delaware              )
corporation,                  )
                              )
            Plaintiffs,       )
                              )
        vs.                   ) No. C 09-cv-5812 RS
                              )     (PVT)
FUSION GARAGE PTE. LTD., a    )
Singapore company,            )
                              )
            Defendants.       )
_____)

VIDEOTAPED DEPOSITION OF

CHANDRASEKAR RATHAKRISHNAN

_____

Thursday, April 22, 2010

CONFIDENTIAL portions bound separately: Pages 44-49, 94-105,

110-158, and 281-334

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY portions bound

separately: Pages 50-56, 65-66, 106-109, and 159-258

REPORTED BY:  DEBRA ALLUSTIARTI CSR 10929 JOB 427851

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

CHANDRASEKAR RATHAKRISHNAN        April 22, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1                           I N D E X

2

3                    INDEX OF EXAMINATIONS

4                                                      Page

5    EXAMINATION BY MR. BRIDGES ................ 10

6    EXAMINATION BY MR. DOOLITTLE ............. 333

7    FURTHER EXAMINATION BY MR. BRIDGES ....... 334

8

9              EXHIBITS MARKED FOR IDENTIFICATION

10    No.                Description            Page

11    Exhibit 1003       E-mail string from ....... 78
                         Chandrasekar Rathakrishnan
12                       to Jonathan Bloom, dated
                         11-16-09, Bate Nos.
13                       FG00029927 through
                         FG00029933
14
                         Exhibit 1004       E-mail string from ........ 92
15                       Chandrasekar Rathakrishnan
                         to Deepak TVS, Arulprasad
16                       Philip Ng, dated 11-17-09,
                         Bate Nos. FG00001648
17                       through FG00001650

18    Exhibit 1005       E-mail string from ........ 97
                         Jonathan Bloom to
19                       Chandrasekar Rathakrishnan,
                         dated 11-17-09, Bate Nos.
20                       FG00029952 through
                         FG00029959
21
      Exhibit 1006       Letter from .............. 98
22                       Chandrasekar Rathakrishnan
                         to American Embassy, dated
23                       9-3-09, Bate Nos.
                         FG00001308 and FG00001309
24

25

Merrill Legal Solutions
(800) 869-9132

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

CHANDRASEKAR RATHAKRISHNAN     April 22, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 258

1              MR. DOOLITTLE:  Does not.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

CHANDRASEKAR RATHAKRISHNAN     April 22, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 259

17:22:33   1         (Nonconfidential testimony resumed.)

17:22:35   2         MR. BRIDGES:  Q.  What was the next step

17:22:41   3    of the due diligence process?

17:22:45   4         A.  So this led up to end February 2009, and

17:22:47   5    during which time, I'd got no response back for the

17:22:54   6    counteroffer that we had for the letter of intent

17:22:57   7    that they provided; except for suggesting that they

17:23:00   8    were reviewing it, and they would revert soon.

17:23:03   9         MR. DOOLITTLE:  They would what soon?

17:23:08  10         THE WITNESS:  They would revert soon;

17:23:12  11    something to that effect.

17:23:14  12         MR. BRIDGES:  Q.  What was the next step

17:23:19  13    of the due diligence process?

17:23:23  14         A.  There wasn't a next step because Louis

17:23:27  15    Monier suggested that raising money for this would

17:23:28  16    be difficult and the project had no legs to

17:23:31  17    continue.

17:23:32  18         Q.  You say there was no next step in the

17:23:34  19    due diligence process?

17:23:39  20         A.  At that point in time.  Because they

17:23:41  21    came back and said that they were not -- that they

17:23:45  22    were not able to raise the money required for the

17:23:48  23    project, and in his opinion, the project had no

          24    legs to continue.  He specifically said this after

          25    a meeting with Google Ventures.

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

CHANDRASEKAR RATHAKRISHNAN      April 22, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 260

| | | |
|---|---|---|
| 17:23:58 | 1 | MR. DOOLITTLE:  Can I just ask you to |
| 17:24:01 | 2 | clarify?  Do you mean there was no more due |
| 17:24:03 | 3 | diligence in this early 2009 time frame? |
| 17:24:04 | 4 | THE WITNESS:  There was a date ended in |
| 17:24:05 | 5 | February. |
| 17:24:07 | 6 | MR. BRIDGES:  Actually, I -- I |
| 17:24:11 | 7 | understand, but I think I need to let you ask |
| 17:24:16 | 8 | questions when I'm through. |
| 17:24:17 | 9 | Q.  So when did Louis Monier make this |
| 17:24:38 | 10 | suggestion you just referred to? |
| 17:24:42 | 11 | A.  Somewhere late February 2009. |
| 17:24:45 | 12 | Q.  In what context did he say that? |
| 17:24:47 | 13 | A.  Don't understand. |
| 17:24:47 | 14 | Q.  Did he say it to you directly? |
| 17:24:48 | 15 | A.  Yes. |
| 17:24:53 | 16 | Q.  Where? |
| 17:24:54 | 17 | A.  Via an e-mail first and then through a |
| 17:24:58 | 18 | phone call. |
| 17:25:01 | 19 | Q.  Was anybody else included in the e-mail? |
| 17:25:03 | 20 | A.  Not that I remember. |
| 17:25:03 | 21 | Q.  Was anybody else on the phone call? |
| 17:25:12 | 22 | A.  No. |
| 17:25:15 | 23 | Q.  What was your reaction to his statement? |
| | 24 | A.  I thought the prototype that was created |
| | 25 | by them did not quite live up to expectation. |

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

CHANDRASEKAR RATHAKRISHNAN      April 22, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 261

17:25:24    1         Q.  In what respects?

17:25:25    2         A.  There's no way the product could be

17:25:28    3    commercialized.

17:25:34    4         Q.  Why not?

17:25:43    5         A.  It was a product put together by

17:25:45    6    off-shelf parts, and one that did not reflect

17:25:46    7    consumer device, whether in design or in function.

17:25:48    8              MR. BRIDGES:  I'm sorry.  Can you repeat

17:26:22    9    his answer for me?

17:26:26    10             (Record read.)

17:26:29    11             MR. BRIDGES:  Q.  What were the

17:26:34    12    customer's desired requirements in design or

17:26:35    13    function that prototype -- that the prototype did

17:26:37    14    not reflect?

17:26:39    15             MR. DOOLITTLE:  Calls for speculation.

17:26:43    16             THE WITNESS:  And to clarify what I

17:26:45    17    meant was, it did not reflect a consumer product.

17:26:47    18             MR. BRIDGES:  Q.  And this was

17:26:48    19    Mr. Monier's opinion?

17:26:49    20             MR. DOOLITTLE:  Objection, misstates

17:26:50    21    testimony.

17:26:52    22             THE WITNESS:  This was my opinion.

17:26:57    23             MR. BRIDGES:  Q.  This was your opinion.

            24    So please tell me how -- by the way, which

            25    prototype were you referring to at that time?

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

CHANDRASEKAR RATHAKRISHNAN      April 22, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 262

| | | |
|---|---|---|
| 17:27:08 | 1 | A.  Prototype B, which was created by |
| 17:27:15 | 2 | TechCrunch, and for which we provided browser |
| 17:27:20 | 3 | software. |
| 17:27:24 | 4 | Q.  So in what ways did that prototype not |
| 17:27:28 | 5 | reflect what consumers desired? |
| 17:27:31 | 6 | A.  The form factor of the device, the |
| 17:27:35 | 7 | design of the device was just not commercial and |
| 17:27:37 | 8 | was not reflective of what a consumer wanted to |
| 17:27:41 | 9 | use.  And that was reflected in Louis's statement |
| 17:27:44 | 10 | about not being able to get funding from VCs, and |
| 17:27:47 | 11 | those were similar reasons he suggested. |
| 17:27:51 | 12 | Q.  Okay.  We can talk about what your views |
| 17:27:53 | 13 | were, and we can talk about what Mr. Monier's views |
| 17:27:56 | 14 | were, as expressed by him to you.  Let me focus |
| 17:27:58 | 15 | right now on your views. |
| 17:28:00 | 16 | You said the form factor and design were |
| 17:28:00 | 17 | not satisfactory? |
| 17:28:04 | 18 | A.  Yeah. |
| 17:28:04 | 19 | Q.  What else about Prototype B was not |
| 17:28:07 | 20 | satisfactory? |
| 17:28:12 | 21 | A.  The software stacks was something that |
| 17:28:16 | 22 | they put together by using open-source solutions. |
| 17:28:16 | 23 | Q.  Does that alone make it unsatisfactory, |
| | 24 | or does that simply -- |
| | 25 | A.  It was just not functioning the way it |

f0ff65e1-8f2e-4e14-90ab-f236cfcdd8d7

# EXHIBIT I

# **Tech**Crunch

Watch TechCrunch Disrupt Live! »

## About Those New CrunchPad Pictures

**Michael Arrington**

Apr 10, 2009

A little background for those of you who haven't heard of the CrunchPad: **This is the post** that kicked off the project. I wanted something I couldn't buy, and found people who said it could be built for a lot less than I imagined. The goal – a very thin and light touch screen computer, sans physical keyboard, that has no hard drive and boots directly to a browser to surf the web. The operating system exists solely to handle the hardware drivers and run the browser and associated applications. That's it.

The key uses: Internet consumption. The virtual keyboard will make data entry a pain other than for entering credentials, quick searches and maybe light emails. This machine isn't for data entry. But it is for reading emails and the news, watching videos on Hulu, YouTube, etc., listening to streaming music on MySpace Music and imeem, and doing video chat via tokbox. The hardware would consist of: netbook appropriate chipsets (Intel Atom or Via Nano), at least a 12 inch screen, a camera for photos and video, speakers and a microphone. Add a single USB port, power in and sound out, and you're done. If you want more features, this ain't for you.

Price? it can be built for less than $250, including packaging. Add in fixed costs and other stuff you have to deal with (like returns), and you can sell it for $300 and probably not go out of business. Physical design is important, and the software is the key to winning.

We stumbled through an **initial prototype** that barely booted, but we finished it in a month. **Prototype B** was much more impressive and usable. That effort was led by **Louis Monier**, with software developed by Singapore-based **Fusion Garage** and industrial design work by by David Yarnell and Greg Lalier from **Dynacept**.

Anyway, we've continued to tinker with the project, which is referred to as Mike's Science Project internally (or, "that thing"). But we certainly aren't ready to talk about anything more at this point. But we did meet with Fusion Garage again today to test out the most recent prototype (B.5?). This is a significant step forward from Prototype B because the software stack is now entirely customized. The last version had a full install of Ubuntu Linux with a custom Webkit browser. This version has a bottom-up linux operating system and a new version of the browser. We also switched from Via to the Intel Atom chip. The total software footprint is around 100 MB total, which is a solid achievement. Also, this time the ID and hardware work was driven by Fusion Garage out of Singapore.

In fact, all the credit should go to Fusion Garage. But frankly we weren't planning on talking about it at all, it just isn't the right time yet. But, to make a long story short, someone accidentally published some photos we took to the web, they were seen and **shortly were everywhere** (**see lots lots lots lots lots more**). Even our own **CrunchGear couldn't resist**.

Ok, so now that what's done is done, where do things stand? Well, I'm not ready to say yet. But one thing I've learned about hardware in the last year is that you need partners to actually make things happen, <mark>and the credit for what we saw today goes entirely to the **Fusion Garage** team.</mark> Those guys are rock stars.

Here's are pictures of the various prototypes in chronological order if you're interested. The first was our initial conceptual drawing.

Advertisement

   

| Now | Commented | Facebook |
|---|---|---|

TechCrunch Disrupt LIVE Webcast, Day One (TCTV)

The List Of Startups Launching At TechCrunch Disrupt

The Panel That Was Definitely, Maybe Not About AngelGate

Windows Live Outsources Blogging, Migrating 30 Million Users To WordPress.com

AngelGate: Chris Sacca Responds To Ron Conway

Bing Gordon: "Zynga Is Four Disruptions In One"

Related Topics

Case3:09-cv-05812-RS    Document207    Filed04/14/11    Page84 of 124

crunchpad

techcrunch

techcrunch web tablet

Advertisement

   

Loading comments…

blog comments powered by DISQUS

Advertisement

   

© 2010 TechCrunch
Powered by WordPress.com VIP
4193K readers
BY FEEDBURNER

About    Advertise    Archives    Contact    Events    Jobs    Network    Staff

# EXHIBIT J

| | |
|---|---|
| **From:** | Michael Arrington |
| **Sent:** | Friday, August 14, 2009 12:42 PM |
| **To:** | Heather Harde |
| **Subject:** | Re: tech crunch connection |

<mark>crunchpad is dead.</mark>
On Auq 14, 2009, at 12:36 PM, Heather Harde wrote:
> Frances. Would love to meet and give you an update on the CrunchPad.
> Please let me know your availability for next week and will see if
> Michael Arrington can join as well.  Are you available to meet in Palo
> Alto (we're at 255 Lytton Ave.)  Thank you,
> Heather
> ███████████████heather@techcrunch.com
>
> -----Original Message-----
> From: Frances Cairns [mailto:frances@thecairngroup.com]
> Sent: Friday, August 14, 2009 12:15 PM
> To: Heather Harde
> Cc: Dave Morin
> Subject: Re: tech crunch connection
>
> Thank you Dave!
>
> Hi Heather, Nice to meet you virtually!   Disney is a client of mine
> and they are interested in knowing more about the crunch pad.  I work
> with the publishing division and they would like to explore a possible
> partnership regarding their content.  Let me know if you have time to
> meet in the next week or so and I could provide an overview of their
> content and demo their new product.  Frances
>
> Frances Cairns
> CEO The Cairn Group
>
>
> On Aug 14, 2009, at 9:42 AM, Dave Morin wrote:
>
>> Frances,
>>
>> Please meet the CEO of TechCrunch, Heather Harde. She is absolutely
>> wonderful.
>>
>> Heather,
>>
>> Frances is also wonderful and gave me my first job in Silicon Valley
>> at Apple. She now does neat things with content and the publishers of
>> the world and getting them to think differently about the future.
>> She's brilliant and a visionary.
>>
>> Hope you guys can connect.
>>
>> Dave
>>
>> On 8/14/09, Frances Cairns <frances@thecairngroup.com> wrote:
>>> Hi Dave--- My client Disney is launching a new digital product and
>>> they want to talk to the guys at tech crunch who are launching their
>>> reader product.  Do you have any contacts at a high enough level
>>> that
>>> I could get a segue?  F
>>>
>>
>>
>> --
>>
>> ---
>> http://davemorin.com
>

Confidential
TC00006550

# EXHIBIT K

| | |
|---|---|
| **From:** | 'Chandrasekar Rathakrishnan' <chandra@fusiongarage.com> |
| **To:** | Michael Arrington <editor@techcrunch.com> |
| **Sent:** | 8/3/2009 7:10:48 AM |
| **Subject:** | Re: |

Mike,

Am available to chat on the phone today pst. Will 530 pm PST work for you ? else, will make myself available at 5 pm. pls let me know.

I sincerely hope that you do not shut the project down. I did not expect the ST article to have such reach within US. again, i am sorry for what happened.

am too far down the road to make a U-turn right now on this project. if you do want to move forward and shut project down, then I have a proposal which could hopefully lead to a

compromise.

let's chat later and figure. thanks, chandra.

On Mon, Aug 3, 2009 at 4:08 PM, Michael Arrington <editor@techcrunch.com> wrote:
we need to talk on the phone tomorrow afternoon PST time. I plan to shut the project down. I want to discuss the post before it goes live, and how we are unwinding the relationship.

Are you free at 4 or 5 pm Calif time?

Mike

TC00002431

# EXHIBIT L

| To: | Michael Arrington(editor@techcrunch.com); Nik Cubrilovic(nik@techcrunch.com)] |
|---|---|
| **Subject:** | FW: Phone discussion-Pls confirm |
| **Sent:** | Thur 8/27/2009 10:20:31 AM |
| **From:** | brian@techcrunch.com |

Summary of his understanding.  We can leave it as is or adjust the language to state that NRE and volume commitment to be negotiated after Market tested.  I will also correct to state that Crunchpad name and all related marketing to date is off the table.

Keep in mind that they could also decide to walk away and attempt to get the FG IP in the cheap.  This product would be in the Asus wheel house.

-----Original Message-----
From: Leo_Tsai@pegatroncorp.com
Sent: Thursday, August 27, 2009 6:14am
To: brian@techcrunch.com
Subject: Phone discussion-Pls confirm

Hi Brian,

It was nice to have an open discussion with you tonight. Right now we are in an important and critical evaluated stage. In order to deliver right information to my management, I would like to summarize our communication by mail. Again, pls understand initial commitment has not been changed by Pegatron.

Of course, this mail is only between Pegatron and Techcrunch. If there is something wrong in my summary, pls correct me. Thanks!

Based on phone call today, Techcrunch came up with 2 alternatives. Pegatron need to officially reply by next Monday (10/31).

- **Techcrunch's solution:**

Based on Techcrunch's initial understanding, there was no NRE or volume commitment. There was mis-communication between Fusion Garage and Techcrunch. The selling plan Techcrunch have was to build 1K in PVT stage and test market reaction. Then, Techcrunch will generate 1 to 3 years forecast based on this pre-sales. If Pegatron is willing to go back to initial Techcrunch's understanding (No NRE / No volume commitment), then, Techcrunch will merge Fusion Garage as a plan and keep supporting this business.

- **Fusion Garage's solution:**

If Pegatron is not willing to change current agreement and MOU ($700K NRE / 1200K life cycle), Techcrunch will drop out this business and stop merging Fusion Garage. Fusion Garage will not get any supporting from Techcrunch or certain famous business units. But, Fusion Garage may keep doing business with Pegatron by itself.

Confidential

# PEGATRON

PEGATRON・UNIHAN CORPORATION image001.gif37639
F: 886.2.81437945
M: 886.0970087639
No. 76, Ligong St.,
Beitou District, Taipei City 112
台北市北投區立功街76號

Confidential

# EXHIBIT M

| | |
|---|---|
| From: | 'Nik Cubrilovic' <nik@techcrunch.com> |
| Sender: | nik@devtap.com |
| To: | Michael Arrington <editor@techcrunch.com> |
| Sent: | 8/18/2009 8:44:49 PM |
| Subject: | Re: Quick Update On Chandra/FG situation |

quick update on the rest of my day yesterday and this morning so far:

* I met a guy called James Chan who works for a local VC firm (Walden)
* told me that Chandra's reputation is horrible
* I was getting advice from him, going through the diff scenarios
* his conclusion/advice was to setup local sing co. and hire Chandra's guys
* said that gov help would be very easy with *everything*
* spoke for hours, he is an excellent local contact to have as he
knows everyone as well and can help us route around
* Met with NUS which is the university, and their program for
investing in startups
* again conclusion here is that grants etc. are readily available,
we just have to tell them what we want
* they are an incubator, so take office space there with other
startups etc. etc.
* while I was there I met with 4 startups in quick succession. ill
need to get these guys into a further update when i get bcak in bcause
1 in potential TC 50, another can build a TC iphone app with our
content on it for free (and solve all our mobile stuff, including .
custom ads etc.)
* met with the Bansea angel investors network – 7 guys in Singapore
who are mostyl foreigners. very very easy sell on the crunchpad to the
point where he almost wet himself. apparently he emailde us asking to
invest a while ago. getting back to me today on debt, but said that
the first tranch of debt from the government was 'easy'
* about to run to meet another local government guy. he is like a biz
dev guy for Singapore and is going to take me through the setting up a
local co. etc.
* overall, im starting to see what this could look like post-FG and
have the foundations setup for what we do enxt

On Wed, Aug 19, 2009 at 2:28 AM, Michael Arrington<editor@techcrunch.com> wrote:
> if you're around lets discuss this.
>
> On Aug 17, 2009, at 9:02 AM, Nik Cubrilovic wrote:
>
>> Have you spoken to Chandra in the past few days? Just want to know
>> what he does doesn't know so far. If you let me run with this, ill
>> meet with him tomorrow and between his recently-found frankness, my
>> new contacts in the sing government and the local VC's/investors I
>> have met I am sure I can get this all back on track. we have
>> everything here in Sing to the point where it is all prepped so we are
>> ready to pull the trigger, come back there meet with you guys, work
>> out what we are going to do and then decide if we either do nothing or
>> proceed under a new form with:
>>
>> * new sing company crunchpad with a parent co. in the USA
>> * debt raised from Gov / local investors
>> * FG team under that co. new and trimmed up
>> * shop the hardware spec around
>> * find a role for chandra
>>
>> `option two is we kill the project and fusion garage also dies` (his
>> talk about raising money to do it himself i think is highly unlikely)
>>
>> `option three is we just poach his guys, run it ourselves`
>>
>> there is no way we can continue the way things have been. i really
>> think option 1 with integrating everything into new co's, having the
>> sing gov put money in (the $250k initial grant they do is apparently a
>> formality, and we could get that in a matter of days with just the

CONFIDENTIAL



TC00000476

```
>> paperwork sorted).
>>
>> if i was making decisions based on crunchpad being mine alone, i would
>> run with option 1 and would do it asap so that the timeline doesn't
>> slip further
>
>
<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE plist PUBLIC "-//Apple//DTD PLIST 1.0//EN"
"http://www.apple.com/DTDs/PropertyList-1.0.dtd">
<plist version="1.0">
<dict>
<key>date-sent</key>
<real>1250653489</real>
<key>flags</key>
<integer>8590196097</integer>
<key>original-mailbox</key>

<string>imap://editor%40techcrunch.com@imap.emailsrvr.com/INBOX/Folders/TechCrunch/crunchpad</strin
g>
<key>remote-id</key>
<string>767</string>
<key>subject</key>
<string>Re: Quick Update On Chandra/FG situation</string>
</dict>
</plist>
```

CONFIDENTIAL

TC00000477

# EXHIBIT N

**From:** Michael Arrington
**Sent:** Wednesday, October 22, 2008 03:32 PM
**To:** Steve Pearman
**CC:** Heather Harde
**Subject:** hawaii!
**Attachments:** FG_CrunchPad.pdf; confidential- status of crunchpad oct 08.ppt

I hear you are here at the conference. See attached status update (see
powerpoint first). let's discuss in person.



Confidential

TC00004107

# CrunchPad Update

## October 2008

confidential

Confidential

TC00004108

# Progress To Date – Announcement

- Announced project on July 21, thousands of "Aha!" comments over next few days.



QuickTime™ and a
decompressor
are needed to see this picture.

Confidential

TC00004109

# Prototype A

- Built working prototype and announced on August 30, five weeks later.

  - [illegible]

  - 12 inch touchscreen, boots right to browser



Confidential

TC00004110

# Prototype B

- Evolving the ID: Non-working Prototype B finished in early September.



Confidential

TC00004111

# Current ID Work

- Working through ID ideas to envision final product. See mockups (separate document).



Confidential

# Current BOM

- Current bill of materials estimates per unit costs (all in) of around $292. We believe we can reduce this by $50.
- See associated BOM.

Confidential

TC00004113

# Software Status

- In addition to internal team, we're working with a Singapore startup that has developed a kick ass working prototype - linux kernel, webkit based browser.
    - 10 second boot time to browser
    - 24 MB software footprint
- We will either acquire the startup (or hire the team), or outsource and own IP.

Confidential

TC00004114

# Additions To Team

- In addition to Heather Harde and Michael Arrington, we have two full time, senior assets:

Louis Monier is best known as the founder, CTO, product guru and spokesperson for AltaVista. Launched in 1995 AltaVista was the first truly modern Internet search engine. Louis was born and educated in France where he got his Ph.D. in 1980. He then spent the early part of his career doing research at Carnegie-Mellon University, XEROX P.A.R.C. and Digital Western Research Laboratory, working mostly on early VLSI design and CAD tools. After AltaVista he was CTO and VP of engineering for BigVine, a Kleiner-Perkins backed start up in the barter space. He then rebuilt the search back-end of eBay, providing users with real-time updates while saving literally billions of dollars in operating costs. Louis then spent two years at Google, building a widely-used internal search engine, and recently served as VP of Products for Cuil.



Kahmin Teh- Prior to this role, Kahmin Teh was Product Marketing Director at Daedalus Systems, LLC, a company he co-founded with other veteran Silicon Valley professionals. He specializes in systems integration of engineering solutions, and providing OEM turnkey systems in support of product launch and customer enablement. Kahmin brings with him almost 20 years of experience in the high technology industry with over 16 years in processor and networking companies such as AMD and AMCC. He had held various engineering, marketing and management positions including responsibilities for multi-location and cross-functional teams. Kahmin has a BSEE from Southern Illinois University and completed his MSEE coursework at the University of California at Davis.



Confidential

TC00004115

# Current Goals

- Finish five beta units with hardware lockdown and beta software
- Close financing to hire additional team

Confidential

TC00004116

# CrunchPad
# Product Design
# Concepts for
# TechCrunch



fG  Fuseproject 2008
TechCrunch 'CrunchPad' Concepts
18 October 2008

Confidential



# Concept 1
## Palm Cradle

fG © FusionGarage 2008
TechCrunch CrunchPad Concepts
18 October 2008

Confidential

Crunchpad



Crunchpad

Confidential

TC00004119



Crunchpad





Slipping one hand beneath the protruded area while the palm follows the bulging curve of the tablet's back gives stability for most postures.

**fG**

Confidential

TC00004120



Confidential



Confidential

# Summary

This design provides a unique cradle for a tablet that allows interaction and awareness. The concept can be formed from a single piece of plastic allowing the general hand moving away from power adapter or appliances.

The curve allows 1 hand to cradle the tablet giving users a free hand to interact with the touchscreen.

Cons:

CrunchPad
Product Design
Concepts for
TechCrunch

# Concept 2
# Picture Frame



*f*G  © FusionGarage 2008
TechCrunch CrunchPad Concepts
18 October 2008

Confidential







**Memories Of Gizmodogate: CES Names Engadget As Official Blog Partner**





**Stealth Semantic Startup Raises $6.5 Million, Won't Tell Us Anything**

**BrightCove Is Already Streaming Hundred Million+ Videos A Month (Some BrightCove S...**



# TechCrunch

## Memories Of Gizmodogate: CES Names Engadget As Official Blog Partner

 

 

**Stealth Semantic Startup Raises $6.5 Million, Won't Tell Us Anything**

Confidential







Confidential

TC00004126



Confidential

CrunchPad
Product Design
Concepts for
TechCrunch

18 October 2008

# Concept 3
# Navigator



*f*G  © Fusion Garage 2008
TechCrunch "CrunchPad" Concepts
18 October 2008

Confidential



Confidential



Confidential



Confidential





Confidential

TC00004134





Confidential

Colour Options





3.5

Confidential

TC00004136

# Summary

As an developing tablet I am working on a new design a shape consistent follows the general trend moving away from boxy tv sets and computer monitors towards a more sleek elongated shape such as the new range of apple monitors.

When held in a landscape orientation the left and right hand edges provide an area for the thumbs to rest when not interacting with the touch screen.

The addition of a navigator button allows users to quickly scroll web pages, navigate back and forwards between webpages and call up the url bar all using 1 button. The keyboard enables the tablet to become a laptop

**fG** 

3.6

Confidential